SOUTHEAST ALASKA CONSERVA-
TION COUNCIL, INC., Appellant,

v.

STATE of Alaska, Robert E. LeResche, as
Commissioner of Natural Resources,
and Schnabel Lumber Company, an
Alaska Corporation, and City of Haines,
Borough of Haines, Appellees.

No. 5855.

Supreme Court of Alaska.

April 29, 1983.

Stephan C. Volker, Sierra Club Legal Defense Fund, Inc., Juneau, for appellant.

G. Thomas Koester, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellees State of Alaska and Robert E. LeResche.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Juneau, and Richard B. Brown, Anchorage, for appellee Schnabel Lumber Co.

Before BURKE, C.J., RABINOWITZ and MATTHEWS, JJ., and DIMOND,* Senior Justice.

## OPINION

MATTHEWS, Justice.

This action by the Southeast Alaska Conservation Council (SEACC) against the Commissioner of Natural Resources and the Schnabel Lumber Company (Schnabel) involves constitutional and statutory challenges to a timber sale contract entered into between the Commissioner on the State's behalf and Schnabel on August 2, 1979. The trial court found for the defendants on the merits and awarded Schnabel attorney's fees against SEACC. SEACC appeals both rulings. We affirm on the merits but reverse the award of attorney's fees.

On June 8, 1979, pursuant to Alaska law,[1] the Commissioner adopted the Haines-Skag-

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. AS 38.04.065(a) provides in pertinent part:

The commissioner shall, with local governmental and public involvement ..., develop, maintain and, when appropriate, revise land

way Area Land Use Plan "as policy of the Department of Natural Resources for state lands within the planning area." The Plan, which covers some 400,000 acres of state-owned or selected land, consists of management guidelines and land classifications that apply to state land and its resources.[2] It was prepared by the Planning and Classification section of the Department of Natural Resources "with the assistance of resource persons, economic and planning consultants and representatives from the Departments of Fish and Game and Marine Transportation and Natural Resource Divisions of Forest Land and Water Management, Parks, and Minerals and Energy Management" and only after several series of public meetings were held in Haines, Skagway and Juneau.

The Plan estimates that there are 84,000 acres of state-owned commercial forest land within the Plan area, not all of which are open to timber harvest. The Plan designates 18 management units classified as "Forest Land" that

will be managed for multiple use of the forest resources, including commercial

timber harvesting. Logging must be conducted in a manner consistent with maintenance of soil stability and productivity, watershed, fish, wildlife, subsistence, recreation, and scenic values, and regeneration of the timber resources. Where necessary, reforestation practices will be used.

Within these 18 management units, the Plan states that there are 54,008 acres of state-owned harvestable commercial spruce and hemlock, after deducting estimated retention factors for slopes over 70%, and wildlife and fishery habitat.[3] In addition, the Plan states that on state-selected lands open to timber harvest there are 16,913 acres of harvestable commercial spruce and hemlock.[4] The Plan estimates that an annual allowable timber cut of 9 to 11 million board feet (mmbf) for state-owned lands, or 12 to 14 mmbf if state-selected lands are included, would be consistent with its provisions.[5]

On August 2, 1979, on behalf of the State the Commissioner entered into a long-term timber sale contract with Schnabel pursuant to AS 38.05.118.[6] The contract requires

use plans which provide, by regions or areas, for the use of the state-owned land.

In addition, 11 AAC 55.010—.030 provide for planning and classification of state-owned land and set forth general guidelines and factors to be considered in preparing land use plans.

2. AS 38.05.300(a) states that the Commissioner "shall classify for surface use lands in areas where he considers it necessary and proper." 11 AAC 55.040—.230 set forth various land classifications, the criteria for determining whether land is within a particular classification, the management goals for each classification, and other uses deemed compatible with each classification.

3. The Plan notes that the retention factors used are estimates only, not recommendations. The Plan also states that "[m]ajor wildlife habitat is located predominantly in cottonwood forest areas. Retention of cottonwood will be considered separately when and if cutting of it is proposed. This retention factor refers only to spruce and hemlock." The retention factor used for protection of fishery habitat in the Forest Land units is an estimated 3% of total acreage.

4. This figure does not account for estimated retention for slope or specific wildlife habitat,

but it does reflect the 3% retention factor used for protection of fishery habitat.

5. The Plan cautions that these figures are only estimates and not recommendations. The chapter entitled "Implementing the Plan" calls for follow-up studies by an inter-agency team to develop more specific guidelines for specific areas. Land can be reclassified if changing conditions or new information warrant it. *See* AS 38.04.065(a); 11 AAC 55.240. The Plan calls for preparation of a "Forest Management Plan" to focus on forest resources management on a more comprehensive basis in which the allowable cut will be recalculated, and for a "Five Year Harvesting Schedule" to determine the order in which areas open to timber harvest should be cut.

6. AS 38.05.118 provides that the Director of the Division of Forest, Land and Water Management may, with the Commissioner's approval, negotiate sales of timber to local manufacturers at appraised value for a period not to exceed 25 years if the Director finds that
    there exists
    (1) a high level of local unemployment;
    (2) an underutilized timber manufacturing capacity; and
    (3) an underutilized allowable cut of state timber.
    AS 38.05.118(c).

Schnabel to reopen and maintain its manufacturing facility in Haines, where all of the timber purchased must be processed. The State in turn must make available to Schnabel 10.2 mmbf (Puget Sound Scale)[7] of merchantable spruce and hemlock net sawlog timber per year from the "Haines Timber Unit" for a period of 15 years. If state selected lands later do not become tentatively approved or patented, the contract volume will be redetermined and may be set as low as 8.2 mmbf per year.[8]

The contract provides that the sale shall be managed in accordance with the Plan's provisions. The contract specifically states that "land reserved from timber harvest under the 1979 Haines Land Use Plan ... is not available for harvest during the term of this contract." Existing state timber sale regulations, subsequently promulgated timber sale regulations, and State Forest Resources and Practices Act regulations are made part of the contract. Under contract section 1(c), "[t]he State may reserve from cutting strips and blocks of timber that (a) have or may subsequently develop special scenic value in connection with water courses, recreation sites and highways, or (b) cannot be logged without violating" certain Alaska statutes that protect natural resources.[9] Such reservations may include areas "requiring special forest practices in order that biological minimums necessary to sustain fish, wildlife, soils, water or other fundamental renewable resources are observed since the State is under an obligation to provide for a sustained yield of all re-

newable resources...." In a protocol appended to the contract, the parties recognize that forest practices may change during the contract term to insure that timber harvest and wildlife survival will be compatible.[10]

Rather than designating specific areas in which logging will occur, the contract states that the State is in the process of preparing a map which, when agreed to by the parties, shall become part of the contract. That map will show where logging activities are to be conducted during the initial operating period of the contract. The contract then calls for five year operating periods for which "the Purchaser may nominate and the State shall determine the areas within which cutting shall be conducted...." Schnabel must submit an annual operations plan to the State for review and approval. With respect to the proposed operations, the State is required to furnish Schnabel with a map "showing locations of work."

Seven days after the contract was signed, SEACC filed an appeal with the Commissioner pursuant to AS 41.17.140(a)[11] asserting that the contract was illegal on numerous grounds. The Commissioner declined to hold a hearing, however, stating that since the challenged administrative action of entering into the contract was taken pursuant to AS 38.05.110–.120, there was no jurisdiction for SEACC's appeal. SEACC then filed a complaint against the Commissioner

---

7. "Puget Sound Scale" is a long log scale, while "Scribner Scale" is a short log scale. A conversion factor of .85 was used during contract negotiations to convert Scribner to Puget Sound Scale. SEACC's trial experts used a conversion factor of .83.

8. At Schnabel's option, the contract can be extended for an additional 10 years, provided six specified conditions are met. One of these conditions is that there have been sufficient regrowth to assure perpetuation of the sustained annual harvest level established by the contract.

9. AS 16.05.840 (providing for construction of fishways); AS 16.05.870 (providing for protec-

tion of fish and game); and AS 41.17.010 *et seq.* (the Forest Resources and Practices Act).

10. The Protocol specifically recognizes "the need to protect bald eagles," and provides that "the State may make interim reservations necessary to protect nest, roosting, or feeding ground abandonment" until regulations or statutes are passed prescribing minimum standards of protection.

11. AS 41.17.140(a) provides in pertinent part: An administrative action of the department under AS 41.17.010—41.17.950 ... may be appealed to the commissioner within 30 days after it is taken.

and Schnabel for declaratory and injunctive relief in the superior court in Juneau.

The basic issue at the trial was whether the contract volume of 10.2 mmbf per year was arrived at in violation of Alaska constitutional and statutory requirements that timber be harvested on a sustained yield basis.[12] SEACC directed its case principally at an allowable cut calculation [13] performed by the Haines Area Forester, Gary Saupe. Mr. Saupe had calculated that the Haines area could sustain harvesting of 11.9 to 13.9 mmbf per year (Scribner Scale), which roughly equals 10.1 to 11.8 mmbf (Puget Sound Scale).[14]

In its Memorandum of Decision the trial court noted that SEACC's experts lacked Gary Saupe's "years of experience" in the Haines area. The court found that Saupe's allowable cut calculation was "if anything on the conservative side." Noting that Saupe's calculations were not the only factors considered by the Department in setting the timber sale volume,[15] the court conclud-

ed that "[t]he decision made by the Commissioner, acting through his duly authorized representatives, was neither unreasonable, arbitrary or capricious." [16] Accordingly, on December 31, 1980, the trial court entered judgment against SEACC and in favor of the State and Schnabel. The court ordered SEACC to reimburse Schnabel for attorney's fees and costs of $25,058.74. This appeal followed.

I

We turn first to a brief discussion of the applicable standard of review. "Where, as here, the question is as to the merits of agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion." *North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978); *Hammond v. North Slope Borough*, 645 P.2d 750, 758–59 (Alaska 1982). Where an

12. *Alaska Const.* art. VIII, § 4 provides that "[f]ish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." AS 38.-04.910(10) defines "sustained yield" to mean "the achievement and maintenance in perpetuity of a high level annual or regular periodic output of the various renewable resources of the state lands consistent with multiple use; ..." AS 41.17.950(14) defines the principle in like terms, but adds that it

does not require that timber be harvested in a non-declining yield basis over a rotation period; ...

SEACC contends that the "sustained yield principle" as used in the constitution accords with the definition set forth in Title 38 and that the added language in Title 41 noted above must be construed narrowly to avoid conflict with the constitutional concept. Specifically, SEACC suggests that the additional language in Title 41 should be read as permitting timber cutting at a level that cannot be sustained over a forest rotation period only in unusual circumstances. We agree. The obvious purpose of making the sustained yield concept a constitutional principle with respect to the forests was to protect them from overcutting. The same motive impelled Congress to enact the principle into law in 1960. 16 U.S.C. § 531(b); *see* 1960 U.S.Code Cong. & Ad.News 2382. A broad reading of the added language in Title 41 would

eliminate this protection. A narrow reading of the statute could still allow cutting more timber than could be sustained over a rotation in proper circumstances. Such circumstances might include such things as salvage cuts where trees have been killed or damaged, or where the particular unit is too small to be harvested economically in annual or frequent entries over a rotation period.

13. An allowable cut calculation computes the amount of timber that can be extracted from an area per year while maintaining a sustained yield of timber for the area.

14. SEACC's .83 conversion formula would convert Saupe's figures to an allowable cut of 9.8 to 11.5 mmbf per year (Puget Sound Scale).

15. The court indicated that expertise within the Department of Natural Resources was solicited and various reports were reviewed, resulting in "a decision involving administrative expertise...."

16. The court indicated that, in its opinion, the contract's mandatory volume provision would be unenforceable "if future re-inventory data shows that the presently fixed allowable cut would conflict with the definition of sustained yield." However, the court decided that this was not the proper proceeding in which to adjudicate the rights between the State and Schnabel.

agency fails to consider an important factor in making its decision, the decision will be regarded as arbitrary. *State v. 0.644 Acres, More Or Less,* 613 P.2d 829, 833 (Alaska 1980). As one distinguished judge has put it, the role of the court is to

> ensure that the agency "has given reasoned discretion to all the material facts and issues." The court exercises this aspect of its supervisory role with particular vigilance if it "becomes aware, especially from a combination of danger signals, that the agency has not really taken a *'hard look'* at the salient problems and has not genuinely engaged in reasoned decision making."

Leventhal, Environmental Decision Making and the Role of the Courts, 122 U.Pa.L.Rev. 509, 511 (1974) (emphasis in original, footnotes omitted).

In this case, our review has been facilitated by the pre-sale preparation of a written finding and decision document by the Director of Forest, Land and Water Management. This document reflects, albeit somewhat sparsely, the facts and premises on which the decision to enter into the contract was based.

■ A decisional document, done carefully and in good faith, serves several salutary purposes. It facilitates judicial review by demonstrating those factors which were considered. It tends to ensure careful and reasoned administrative deliberation.[17] It assists interested parties in determining whether to seek judicial review. And it tends to restrain agencies from acting beyond the bounds of their jurisdiction. *Mobil Oil Corp. v. Local Boundary Comm'n,* 518 P.2d 92, 97 n. 11 (Alaska 1974).

■ In the present case, the review conducted by the superior court should have focused on the decisional document. If the document was found to contain an inadequate reasoned explanation, the court was authorized to remand it to the agency for supplementation[18] instead of conducting a trial.[19] In future cases involving important natural resource sales we strongly suggest such a remand if the basis for agency action is unclear. Here, however, as a result of the Director's written decision and the trial evidence the reasoning underlying the sale is clear.[20] Thus, at this point, no remand for supplementation is necessary.

## II

SEACC argues on appeal that the contract between the State and Schnabel is invalid because it violates the constitutional

---

17. As Davis puts it:
    [C]ourts should take into account that findings and reasons are usually two of the four elements in a bundle of protections against arbitrariness—open standards, open findings, open reasons, and open precedents.
    3 K. Davis, Administrative Law Treatise § 14.-26, at 123 (2d ed. 1980).

18. *See, e.g., Hammond v. North Slope Borough,* 645 P.2d 750, 758 (Alaska 1982), where we approved a remand by the superior court to the Commissioner for additional findings on a subject of concern. *See generally* 3 K. Davis, *supra* note 17, § 14.24, at 112–16.

19. For example, *Hammond v. North Slope Borough,* 645 P.2d 750 (Alaska 1982) involved an important oil lease sale in which the Commissioner did prepare a decisional document. A comprehensive challenge to the sale was made. However, judicial review concerned the adequacy of the Commissioner's reasons as expressed in his written decision and no trial was necessary. *See also* Professor Davis' comment concerning the lengthy sequel to the Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):

> The lack of a requirement of findings caused much litigation of the Overton Park case; see 309 F.Supp. 1189; 432 F.2d 1307; 335 F.Supp. 873; 494 F.2d 1212. The later litigation could have been avoided if the Secretary had stated findings. Unless the Overton Park holding with respect to findings is superseded by law requiring findings in such circumstances, much more needless, complex and expensive litigation will ensue.

3 K. Davis, *supra* note 17, § 14.23, at 108.

20. For example, the decisional document makes it plain that the sale was premised on nondeclining sustained yield calculations, as the document puts it, "on an even flow sustained yield basis;" that the Plan was consulted in the sale decision-making process; and that the sale was found to be consistent with the Plan.

directive [21] that Alaska's natural resources be managed according to the sustained yield principle. In support of this allegation, SEACC asserts that forester Gary Saupe used an improper timber base, an improper old growth volume, an improper new growth volume, and an improper rotation age [22] in reaching his allowable cut calculation.[23]

### A. The Timber Base

SEACC argues that since Saupe's allowable cut calculation predated the adoption of the Plan, the contract volume fails to incorporate the Plan's land classification regime and site-specific guidelines. According to SEACC, this alleged failure violates 11 AAC 55.030(c).[24]

The trial court concluded that the alterations in the Plan's land classifications after Saupe's calculation were not significant, since the plan shows a timber base larger than that used by Saupe.[25] However, SEACC contends that the Plan's site-specific management guidelines take precedence over the Plan's estimated timber base, and that in order for the contract volume to comport with 11 AAC 55.030(c), the Commissioner was required to calculate and take into account specific retention figures based upon those guidelines.

Although 11 AAC 55.030(c) requires that timber sales be consistent with the guidelines, no duty to calculate specific retention figures is necessarily required so long as it can be reasonably concluded that the sale will not violate the guidelines. Here the sale volume was consistent with the low end estimates contained in the plan.

The evidence suggested that the Commissioner concluded that safeguards built into the contract assured that the harvesting of timber would be consistent with the Plan's site-specific management guidelines. The contract specifically provides that the State may reserve from harvest areas which the State considers necessary "in order that biological minimums necessary to maintain fish, wildlife, soils, water or other fundamental renewable resources" will be preserved. The contract also expressly recognizes that areas reserved from timber harvest under the Plan are not available for harvest during the term of the contract.

The Commissioner could reasonably have concluded that these contractual provisions, taken with the 17,000 acre margin for error indicated by comparison of the Plan's estimated timber base and Saupe's timber base, would permit cutting consistent with the site-specific guidelines of the plan.

21. Alaska Const. art. VIII, § 4; see note 12 supra.

22. Each of these is a variable used in arriving at an allowable cut calculation.

23. SEACC's arguments implicitly assume that Saupe's allowable cut calculation was the only basis for the contract volume. However, the trial court found that it was only one of several factors that the Commissioner considered in adopting the contract volume. Among the other factors were intra-departmental expertise, the 1965 LaBau-Hutchinson report, and Schnabel's ability to obtain financing to reopen its Haines facility. Reed Stoops, the Commissioner's representative in the contract negotiations, testified that another factor considered was protection of natural resources, especially eagles, fisheries, moose, and mountain goats. In addition, although Saupe's calculation predated adoption of the Plan, Stoops testified that the contract volume was left open until after the Plan's adoption.

24. 11 AAC 55.030(c) provides:
   An area land use plan or land use planning report may contain site specific management guidelines concerning the type, degree or amount of certain uses within the classification. Such management guidelines are part of the classification order, and all uses or disposals to private ownership must be consistent with them. Review of the classification order must include a review of the land use plan and the management guidelines.

25. The Plan estimates a total timber base of 70,921 acres, the sum of 54,008 acres of state-owned harvestable spruce and hemlock, and 16,913 acres of state-selected land. Saupe's timber base for both state-owned and state-selected lands was only 56,900 acres. Comparing these figures, the trial court concluded that it could reasonably be inferred that Saupe's allowable cut calculation "was on the low or conservative side."

### B. *Old Growth Volume*

SEACC next argues that in arriving at his allowable cut calculation, Saupe used an old growth volume[26] that was not as accurate as it might have been. Specifically, SEACC asserts that Saupe did not utilize all applicable data in making the calculation, in contravention of AS 41.17.060(b)(1).[27]

Saupe arrived at his allowable cut range by using the 1965 LaBau-Hutchinson Study as a high end old growth volume, and by then discounting the LaBau-Hutchinson numbers by an amount that he felt would account for defect and breakage. He arrived at the discounted figure based upon his eight years of experience in the Haines area. This range of old growth figures resulted in an allowable cut range of 11.9 to 13.9 mmbf (Scribner Scale).

■ SEACC asserts that Saupe had available "hard data" that would have yielded a more exact old growth volume. This consisted of a Department of Natural Resources compilation of timber previously harvested in the Haines area that was prepared in January 1979. SEACC claims that by using this compilation in conjunction with the State's "timber type maps," Saupe could have arrived at an average volume per acre that would have produced a more accurate old growth volume. Failure to do so, according to SEACC, resulted in violation of the command of AS 41.17.060(b)(1) to use "all applicable data."

26. "Old growth volume" refers to the present volume of timber that can be harvested per acre in an old growth area.

27. AS 41.17.060(b)(1) provides: "[T]o the maximum extent possible, all applicable data and information of applicable disciplines shall be updated and used in making decisions relative to the management of forest resources; ..."

28. "New growth volume" refers to the volume of second generation trees of a certain diameter at breast height (dbh) that will be available for harvest upon completion of harvesting first generation old growth trees.

29. For a discussion of rotation age, *see* subsection D *infra*.

30. AS 41.17.060(c)(1) and (4) provide, in pertinent part:

While we agree that the compilation did contain relevant information, we do not believe that the failure to refer to it means that the sale must be set aside. First, when Saupe calculated the allowable cut for the sale, the data had not been compiled. He made his calculation in December 1978, but the compilation was not completed until January 1979. Further, the compilation did not purport to show the volume of timber from each acre that was actually harvested. In order to make such a determination a process of extrapolation based on debatable assumptions was required. Moreover, the compilation as interpreted by SEACC is not inconsistent with Saupe's conclusion. According to SEACC, the compilation showed a range of old growth volumes of 16,700 to 20,800 board feet per acre (Scribner Scale). Saupe used a low end figure of 20,000 board feet per acre, which is within this range.

### C. *New Growth Volume*

SEACC contends that the new growth volume[28] used by Saupe in his calculation included trees too small to be commercially useful over the 100 year rotation period,[29] and therefore that use of that volume violated the provisions of AS 41.17.060(c)(1) and (4).[30]

Saupe arrived at the new growth volume through use of a table utilizing trees of a 7 inch diameter at breast height and greater.[31] SEACC contends that since the

With respect to state and municipal forest land ..., the following standards ... apply: (1) forest land shall be administered for the multiple use of the renewable and nonrenewable resources and for the sustained yield of the renewable resources of the land in the manner which best provides for the present needs and preserves the future options of the people of Alaska; ...

....

(4) timber harvesting is limited to areas where data and information demonstrate that natural or artificial reforestation techniques will result in the production of a sustained yield of merchantable timber from that area;

...

31. This does not mean that all of the second growth trees will only be 7 inches dbh when they are cut. Apparently, many of them will be of a size useful for lumber under present stan-

present contract as well as industry practice consider only timber of 12 inches dbh and over to be merchantable, the allowable cut calculations should not have been relied on. SEACC then argues that this error violates the dictate of AS 41.17.060(c)(4) that timber harvesting occur only where production of a "sustained yield of merchantable timber" will be possible.

■ Saupe testified that he used the 7 inch dbh table based upon his past experience in the Lake States with pulp wood and a supposition that in the future more harvesting of pulp wood would occur in the Haines area. Schnabel's expert witness, Dr. Carl Newport, also testified that use of the lower dbh figure was consistent with the concept that in the future smaller trees would be utilized in the Haines area. These conclusions regarding future industry practice in the Haines area do not seem beyond the bounds of reason.

### D. Rotation Age

SEACC finally contends that Saupe erroneously employed a rotation age [32] of 100 years in arriving at his allowable cut calculation, thereby violating applicable provisions of the Alaska Constitution and the Forest Resources and Practices Act.[33]

■ Saupe used this rotation age because it was the age that had always been used for the Haines area. This rotation age was also employed in the 1965 Forest Service inventory for the area. SEACC contends that a rotation age of 150 years would more nearly guarantee a sustained yield of merchantable timber. Apparently, a silvicul-

tural rotation age is reached for a stand of second growth trees at that year beyond which the total average annual increase in volume becomes less. There was evidence that this age is reached in Southeastern Alaska generally at about 75 years. However, another factor which enters into the choice of a rotation age is the desired minimum diameter of the trees to be cut. There was evidence that given a desired minimum of 7 inches dbh, selection of a 100 year rotation period would be within the period in which usable volume is at a maximum. Thus selection of that rotation age was not unreasonable.

### III

After trial, the court awarded Schnabel costs and partial attorney's fees against SEACC totaling $25,058.74. SEACC appeals that award, contending that as a "public interest plaintiff" it is insulated from the normal application of Civil Rule 82.[34]

In its Findings of Fact and Conclusions of Law, the trial court determined that as prevailing parties, both the State and Schnabel were entitled to costs and attorney's fees. SEACC objected to that finding. In an Order entered December 31, 1980, the trial court found that SEACC had acted in good faith in bringing this action, and that the public interest exception to Rule 82 prevented taxing the State's attorney's fees against SEACC. However, the court then determined that SEACC could properly be ordered to partially reimburse Schnabel for its attorney's fees. It first

dards. But use of the table does assume that 7 inch trees will be commercially useful when cut.

**32.** "Rotation age" refers to the time passing between the initial harvest of an area and the second harvest of the same area.

**33.** In its reply brief, SEACC alleges violation of AS 41.17.060(c)(1), see note 29 supra. Although in its opening brief SEACC fails to delineate which sections of the Alaska Constitution or the Forest Resources and Practices Act are allegedly violated, we surmise from the context that SEACC also alleges violation of

Alaska Const. art. VIII, § 4, see note 12 supra, and AS 41.17.060(c)(4), see note 29 supra.

**34.** Civil Rule 82(a)(1) contains a schedule of attorney's fees that "will be adhered to in fixing [attorney's] fees for the party recovering any money judgment" in an action, "[u]nless the court, in its discretion, otherwise directs, ..." The Rule then provides:

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.

Our holding today encompasses both the costs and attorney's fees in this action.

stated that no Alaska decision had to that date denied a prevailing non-governmental party its attorney's fees simply because the litigation involved vindication of a matter of public interest. The court then quoted dictum from *Moses v. McGarvey,* 614 P.2d 1363 (Alaska 1980):

> We do not address whether we would affirm an award of full fees if the trial court had made a finding that this is a public interest law suit. We do note, however, that the cases discussing full fees on that basis have involved public or governmental agencies and that in no case have full fees been assessed against an individual defendant on the public interest theory. It is entirely justifiable for a public or governmental agency to bear the full costs of litigating a public interest question because the public benefits. In cases involving the personal liability of an individual defendant, there is no such benefit conferred on the defendant as a result of litigating a question of genuine public interest.

*Id.* at 1369–70 (footnotes omitted). The trial court then noted that not only did Schnabel receive no benefit from this action, it indeed had incurred a substantial liability. Extrapolating from the *Moses* dictum and this conclusion, the court determined that since Schnabel received no benefit from SEACC's action, as would the public when a state agency was involved, the public interest exception to Rule 82 should not bar partial reimbursement of Schnabel's attorney's fees.

It is well settled that a trial court award of attorney's fees will be overturned only if it involves an abuse of discretion. *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 222 (Alaska 1982); *Anchorage v. McCabe,* 568 P.2d 986, 989 (Alaska 1977). However, in *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974), we stated "it is an abuse of discretion to award attorneys' fees against a losing party who has in good faith raised a question of genuine public interest before the courts." *Id.* at 1136.

■ Later cases have further clarified the policy behind the public interest exception first announced in *Gilbert.* *Anchorage v. McCabe,* 568 P.2d 986 (Alaska 1977) noted that the policy of the *Gilbert* case was "to encourage plaintiffs to raise issues of public interest by removing the awesome financial burden of such a suit." *Id.* at 990. *Thomas v. Croft,* 614 P.2d 795 (Alaska 1980) indicated that a plaintiff who in good faith seeks to vindicate matters infused with strong public policy concerns should not be penalized by having attorney's fees taxed against it unless its suit is frivolous. *Id.* at 798.

We hold to these declarations of the policy behind the public interest exception to Rule 82. Since that policy seeks to encourage the vindication of the public interest, we perceive no reason to distinguish between the public or private character of the defendant in a particular public interest lawsuit. It is the interest that the plaintiff seeks to protect and not the public or private character of the defendant that is the touchstone.

We therefore must determine whether SEACC sought to protect the public interest when it filed this action. In the recent case of *Kenai Lumber Co. v. LeResche,* 646 P.2d 215 (Alaska 1982), we identified four criteria that must be addressed to determine whether a particular lawsuit involves the public interest:

> (1) Is the case designed to effectuate strong public policies?
>
> (2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?
>
> (3) Can only a private party have been expected to bring the suit?
>
> (4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance?

*Id.* at 222–23; *see Anchorage v. McCabe,* 568 P.2d at 991.

■ This lawsuit meets all four tests. Indeed, neither Schnabel nor the State mounts any serious opposition to SEACC's claimed public interest status. SEACC

filed suit to invalidate a contract that it in good faith believed violated the constitutional and statutory policies requiring that timber in Alaska be harvested according to the sustained yield principle. If it had been correct, every Alaskan would have benefitted from its vindication of this strong public policy, since State natural resources that were not being properly protected would have been so protected as a result of SEACC's suit. Since the contract was between the Commissioner of the Department of Natural Resources, a state entity, and a private lumber company, no public entity could have been expected to bring this suit. The responsibility of necessity fell upon a private entity, SEACC. Finally, there is no hint that SEACC had any economic incentive in filing this action; its sole objective was to challenge what in its good faith view was an improper and illegal disposal of Alaskan timber.

Therefore, the award to Schnabel of attorney's fees was an abuse of discretion and must be reversed.

AFFIRMED IN PART, REVERSED IN PART.

RABINOWITZ, J., dissents.

CONNOR and COMPTON, JJ., not participating.

RABINOWITZ, Justice, dissenting.·

## I. *Definition of Sustained Yield.*

The basic issue at the trial in the superior court was whether the contract volume of 10.2 mmbf was arrived at in violation of Alaska constitutional and statutory requirements that the timber be harvested on a sustained yield basis. The majority notes its agreement with SEACC's contention that AS 41.17.950(14), which permits harvesting resulting in a declining yield over a rotation period, must be construed narrowly to avoid a conflict with article VIII, section 4 of the Alaska Constitution and AS 38.04.-910(10). I agree with the court's adoption of SEACC's position here and note that the superior court finding no. 49, as well as the interpretation of "sustained yield" followed by the Department of Natural Resources

[DNR] in reaching its decision as to the "allowable cut," conflict with our interpretation of the "sustained yield" principle.

Although the decisional document accompanying DNR's determination to enter into the contract challenged by SEACC does not explicitly define "sustained yield," testimony elicited from Geoffrey Haynes, Deputy Commissioner of the DNR, indicates that the agency's interpretation of the principle was directly antithetical to that proposed by SEACC and adhered to in the draft. He stated that:

> [A]s far as our administrative interpretation ... the non-declining yield concept was not applicable to sustained yield and does not have to be used in the calculation of any allowable cut.

Mr. Haynes then testified that this understanding of the agency's mandate directly affected its decision to market the quantity of timber sold to Schnabel under the disputed contract:

> In this case, we have a fifteen-year contract with the Schnabel Lumber Company. Rotation period, I believe, up there is a hundred years. That means we are only committing fifteen years of the timber in that area.
>
> . . . .
>
> And the provisions in the contract are protective of other resources, as well as the flexibility we have administrative[ly] at the end of that fifteen-year period—or twenty-five-year period if it goes that long, to re-determine any kind of volumes that will be necessary if timber harvesting, in fact, were to occur there for the remaining seventy-five years.

I read note 12 of the court's opinion as rejecting the agency's assumption that a declining yield during a rotation period is acceptable. In so doing, the majority in effect invalidates the methodological approach used by the agency in determining the allowable cut in the Haines area for purposes of the Schnabel contract. In my view, this mandates a remand to the de-

partment for redetermination in light of an appropriate construction of "sustained yield."[1]

## II. Allowable Cut Calculation—Timber Base.

In my opinion SEACC persuasively contends that the allowable cut calculation principally relied upon by the DNR in negotiating the Schnabel contract failed to reflect the land use guidelines set out in the Haines Land Use Plan. There is no dispute that the December 1978 calculation predated adoption of the final plan in June 1979 and did not reflect changes made in land classification by the latter.[2] Mr. Saupe, who prepared the calculation, admitted that

such a revision would have been appropriate.

The superior court rejected this argument (as does the majority) by pointing out that the total harvestable acreage figure used by Saupe was less than that set forth in the final Plan. However, the "total harvestable acreage figure" set out in the Plan included thousands of acres which in fact are not open to immediate logging. They are included in the total because they may be opened up in the future, but at present they are inaccessible and it is apparent that they may remain so perpetually.[3] For purposes of the Schnabel contract, these acres should therefore not have been treated as if the timber resources they contain will be

1. In determining whether the Commissioner of Natural Resources could reasonably have concluded that the subject contract does not violate sustained yield principles it is my view that the "reasonable basis" standard of review is inapplicable. See State v. Aleut Corp., 541 P.2d 730, 736 (Alaska 1975); Mukluk Freight Lines, v. Nabors Alaska Drilling, 516 P.2d 408, 412 (Alaska 1973).

2. State Forester Theodore Smith assumed that Saupe's calculations were based on "total harvestable acreage" figures set forth in the Plan. He never considered a timber based other than that utilized by Saupe:

    Q. You never considered a timber base other than that employed by Mr. Saupe in his allowable cut calculation in your decision to fix the contract volume at 10.2 million board feet?
    A. No.
    Q. At the time of your decision to recommend to the Commissioner a contract volume at or about the level of ten million feet per year, did you give any consideration to the fact that the timber base had changed as a result of the Haines-Skagway area Land Use Plan adoption in June of 1979?
    A. No, the Plan didn't change the timber base. The Plan was an expression of our management intentions at that time, but neither the Plan nor the classification for retention categories ... remove[s] land from the timber base. The Plan merely says how we intend to manage it.
    Q. So that it would make no difference in your view whether the Plan excludes from logging areas which were previously included in the timber base on which Mr. Saupe's allowable cut calculation was based?
    A. The recommendation to exclude it from logging does not remove it from the timber

    base. It says you need to do something other for a given period of time in every case before you log it. The question of logging or not logging is a management decision, and as long as it is multiple use management, by its classification, then you can consider logging as one possible use of the area.

3. SEACC cites numerous portions of the Plan in support of its contention that over 10,000 of the 70,921 "total harvestable acres" set out in the Plan might be withdrawn from availability for commercial logging. For example, the State neglected to review figures in the draft before publication of the final Plan to reflect the fact that Kicking Horse Valley had been reclassified in the interim, from "forest" to "public recreation" land. The Plan states that retention factors for steep slopes and specific wildlife values in several units have not been calculated for state-selected lands, and that present harvestable acreage figures will have to be revised accordingly. Logging is prohibited by the Plan within a 500-foot-wide buffer zone adjacent to Chilkat Lake. The Plan indicates that the discovery of a conflict between logging and eagle use in the Chilkat Eagle Habitat would reduce harvestable acreage, a result mandated by Governor Hammond's moratorium. Logging is prohibited for fifteen years in the Pyramid Harbor/Davidson Glacier area to permit assessment of its multiple use potential. With reference to preservation of wildlife habitat, the plan prohibits commercial logging in the Upper Takhin River area and permits it in Murphy Flats only if compatible with moose habitat protection. Land included in Units 2 and 6 should not be logged until studies of its agricultural potential have been completed. Finally, the Board of Regents has conditioned disposal of timber on University land upon approval of its appraised value.

available to satisfy sustained yield requirements.[4]

A limited comparison of the raw totals of harvestable acreage used by Saupe and proposed in the Plan fails to do justice to the precision with which Saupe made his allowable cut calculation. I do not think that one can summarily conclude that his estimate would not have been affected by the 1979 proposed withdrawals. In failing to consider the withdrawals of acreage from commercial logging effected by the 1979 Plan before entering into the Schnabel contract, and neglecting to revise its allowable cut figures,[5] it is my view that the agency clearly ignored an important factor in reaching its decision regarding permissible levels of timber harvesting in the Haines area. Thus, its decision was arbitrary, and should be remanded for a redetermination. *State v. 0.644 Acres, More or Less,* 613 P.2d 829, 833 (Alaska 1980).

### III. *Allowable Cut Calculation — New-Growth Volume.*

The DNR is statutorily required to manage state-owned timber land in a manner which ensures "production of a sustained yield of merchantable timber from that area." AS 41.17.060(c)(4) SEACC correctly questions Saupe's assumption that a new growth volume of 7 inches dbh is sufficient to satisfy this requirement. Presently, only timber of 12 inches dbh is merchantable in the Haines area, since this size is necessary for the production of lumber. Trees 7 inches dbh are useful only for pulpwood.

Such trees are not merchantable at present in Haines, and Saupe admitted there was no basis for his assumption that they would be in the future. SEACC elicited expert testimony indicating that a pulp mill located in Haines drawing on that forest area alone would be uneconomical.

Even if one assumes that pulp wood would be merchantable in Haines within the next century, it is necessary to reconcile this premise with the dictates of AS 41.17.-060(c)(1), which requires that forest lands be administered "in the manner which best provides for the present needs and preserves the future options of the people of Alaska." It seems to me that future generations will enjoy fewer options if they inherit forests of 7 inches dbh rather than 12 inches dbh timber. Admittedly, the present needs of the Haines population dictate that the sawmill be revitalized. However, SEACC argues that the quantity of timber sold to Schnabel should not be of a magnitude which reduces the quality of timber available to future generations.

I view this question as raising important issues of statutory and constitutional construction, leaving us free to exercise our independent judgment in reviewing the appeal. Implicit in Saupe's calculation is the premise that the Forest Practices Act and article VIII, § 4 of the Alaska Constitution do not require that future generations be left with timber resources of the quality that are available now.[6] In my opinion, this

---

**4.** Forester Smith testified as follows:

Q. Well, in considering logging as a possible use of the area, does a land manager, in calculating the allowable cut, make any allowance for the possibility that lands may be unavailable for harvest, notwithstanding the fact that they contain commercial forest land?
A. Not in computing the allowable annual cut. You would certainly take that into consideration before you sign a contract for a certain amount of timber to be cut and removed.
Q. Why is it important to consider what areas may be unavailable for logging when deciding whether or not to enter into a timber sale contract?

A. Because a contractual relationship is certainly more stringent than a classification action.

**5.** Although Smith testified that such areas need not be excluded from a timber base used in calculating an allowable cut, *see supra* note 4, that observation was based on the assumption that over-harvesting could be corrected during the 100 year rotation period.

**6.** Governor Jay S. Hammond's transmittal letter of April 8, 1978, accompanying Sponsor Substitute for Senate Bill No. 59 (a forerunner to the final version which was adopted by the Forest Resources and Practices Act) read in part:

Development of this transmittal letter reflects my wish to limit the language of the Act to essential matters while providing the

result contravenes the purpose of these provisions. Quality as well as quantity of available resources must be considered in determining whether sustained yield requirements have been met. The framers and legislature must have intended that the level of timber available to future generations for sawmills as well as pulp mills be undiminished. Thus, I believe Saupe's assumption regarding acceptable new growth volume should have been rejected.

intent behind its provision. I offer the Act and the letter as a package, with the statements of intent in the letter to govern application and interpretation of the Act. The appropriate committees of the legislature are strongly urged to adopt this transmittal letter as the committee report on the bill.

. . . .

Paragraph (1) recognizes the importance of determining the reforestation capacity of land before timber harvesting. The determination is to be made by the government. This standard is not intended to mandate a non-declining yield type of management, but it does reflect the paramount state interest in having all forest land (unless legitimately converted to another use) continue to produce merchantable timber over the long term.

. . . .

Paragraph (5) recognizes the fundamental public trust obligation of the state to insure that the capability of the land to produce renewable resources is not impaired. While a particular species of tree or wildlife may have little relative value now, the future may find it suddenly in great demand. If the land is incapable of producing it to the demand level, an important land management option is lost, to the detriment of the public welfare.