**LOWER KUSKOKWIM SCHOOL DISTRICT and Alaska Department of Education, Appellants and Cross–Appellees,**

v.

**FOUNDATION SERVICES, INC., Appellee and Cross–Appellant.**

Nos. S–6348, S–6458.

Supreme Court of Alaska.

Feb. 2, 1996.

Saul R. Friedman, Hedland, Fleischer, Friedman, Brennan & Cooke, Anchorage, for Appellants and Cross–Appellees.

Myron Angstman, Angstman Law Office, Bethel, for Appellee and Cross–Appellant, Foundation Services, Inc.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

In the spring of 1993, the Lower Kuskokwim School District (LKSD or District) awarded, and the Alaska Department of Education (DOE or Department) subsequently approved, a school transportation contract to Transnorth Corporation, the incumbent provider of bus service for children in the District's twenty-two villages. Foundation Services, Inc., an unsuccessful bidder for the contract, sought appellate review claiming, among other things, that Transnorth's proposal was fraudulent and that the Department abused its discretion in approving the contract. The superior court reversed the Department's decision and awarded the contract to Foundation Services. LKSD and the Department now appeal. We reverse the superior court's decision.

### II. FACTS AND PROCEEDINGS

■ Anticipating the expiration of its then current student transportation contract, LKSD began the process of awarding a new contract in December 1992. On December 15, after receiving the Department's approval, LKSD solicited bids for a five year contract commencing July 1, 1993. In response, only two proposals were submitted: one by Foundation Services and one by Transnorth. At the time, Transnorth held the contract and had provided the District with bus service since 1977, a span of fifteen years. Foundation Services' bid was $1,463.00 per school day while Transnorth's was $1,491.93, a difference of approximately two percent. LKSD determined that both proposals were "responsive."

The LKSD Board of Education (Board) then met to consider the proposals. Though Foundation Services submitted the low bid, DOE regulations did not mandate that it be awarded the contract. 4 Alaska Administrative Code (AAC) 27.085(f)(1)(B) allows the LKSD Board to award the contract

> to a proposer whose responsive proposal is within five percent of the responsive proposal with the lowest dollar amount if the proposer agrees to match the responsive proposal with the lowest dollar amount and the board determines that the offer to other than the low proposer is in the best interests of the district.

Thus, if it was in the "best interests of the district," the Board could award the contract to Transnorth since its bid was within five percent of the bid placed by Foundation Services. The Board exercised this option under 4 AAC 27.085(f)(1)(B) and awarded the contract to Transnorth, since Transnorth had agreed to match Foundation Services' offer of $1,463.00 per day.

The Board based its decision on Transnorth's longstanding record of providing quality service. As David Shields, Business Manager for LKSD, stated in a letter to Harry Faulkner, Jr., President of Foundation Services:

> The School Board's decision hinged on the fact that, all other things being equal, Transnorth Inc[.] had the proven, demonstrated, experience to successfully perform the services with the least amount of oversight and problems for the school district, and therefore was in the best interests of the school district.

Foundation Services subsequently petitioned the Board, pursuant to 4 AAC 27.085(g), to reconsider its decision.[1] In its petition, Foundation Services asserted three grounds for reconsideration: (1) Trans-

---

1. 4 AAC 27.085(g) states:

   Within five working days following the district school board's offering a contract, a proposer whose responsive proposal was not accepted may petition the board, in writing, for reconsideration of its action. Petitions for reconsideration are limited to the following grounds, which must be specified: (1) fraud or duress by the district school board or a proposer; or

   (2) error of the district school board in calculating dollar amounts. The aggrieved proposer shall deliver the petition to all other proposers. The district school board shall decide the scope and form the reconsideration will take, except that all responsive proposers must be given the opportunity to be heard on the petition.

north's proposal was fraudulent and nonresponsive, (2) the Board abused its discretion in awarding the contract to Transnorth without making a full investigation into Transnorth's ability to perform the contract, and (3) 4 AAC 27.085(f)(1)(B) violates Alaska's procurement code.[2]

On April 6, 1993, the Board held a special meeting to address Foundation Services' petition for reconsideration. Board members were provided with packets of all the information that Foundation Services and Transnorth had presented to the District. After presentations by counsel for both parties, no motion for reconsideration was offered, and the award of the contract to Transnorth stood as originally granted. LKSD and Transnorth thereafter entered into a written contract.

On June 1, 1993, the Department approved the contract relying in part on a recommendation of a member of its staff which stated:

> After reviewing the documentation submitted by both proposers and the school district, I recommend that the department approve the proposal selected by the school district board and award the contract to Transnorth, Inc. The school board certified both proposals as responsive, heard testimony from both proposers in response to the petition for reconsideration and awarded the contract in compliance with regulations to the proposer that they felt would best serve the district.
>
> . . . .
>
> Although it appears that the principals of Transnorth may have had some financial problems in prior years, these matters have not affected pupil transportation services. Transnorth has a proven track record with the district, they have the necessary equipment on-site to perform the services and due to their experience they will be able to perform the contract with a minimum of oversight. The district school

board has also taken these matters into consideration.

> I recommend approval of the district's request to award the pupil transportation contract for FY94–98 to Transnorth.

Foundation Services then timely filed a Notice of Appeal with the superior court. The superior court reversed the LKSD Board and Department on two grounds: (1) Transnorth's proposal was nonresponsive, and (2) the Department abused its discretion in approving the contract. Relying heavily on the fact that Transnorth did not timely file its biennial report or pay its corporate tax, the superior court held that "Transnorth Corporation was not in compliance with state law. Therefore, its proposal is not responsive." The court reasoned:

> Simply stated the Department of Education approved a contract between LKSD and a corporation which is not in good standing with the state of Alaska. By ignoring Transnorth's failure to qualify as a corporation in good standing with the state, the Department of Education abused its discretion.

The superior court then concluded that "the contract should be awarded to the lowest, responsive bidder, Foundation Services, Inc., subject to the approval of the Department of Education." LKSD and the Department now bring this appeal.

### III. DISCUSSION

■ This appeal raises three issues: (A) whether Transnorth's proposal was "responsive," (B) whether the Department abused its discretion in approving the contract, and (C) whether the superior court erred when it awarded the contract to Foundation Services rather than remanding the case to the Department for additional findings.[3]

---

**2.** These grounds comprise the basis of Foundations Services subsequent appeal to the superior court. As to ground three, the superior court held that the regulation does not violate the state procurement code, and Foundation Services did not appeal this ruling. Thus, we do not address that issue.

**3.** Though the relevant standards of review are discussed within the context of each issue presented, we note at the outset that "because the superior court acted as an intermediate appellate court, we do not give deference to its decision." *Lake and Peninsula Borough v. Local Boundary Comm'n*, 885 P.2d 1059, 1062 (Alaska 1994) (citation omitted).

A. *Transnorth's Proposal Was Responsive.*

■ In awarding the student transportation contract, the LKSD Board could "offer the contract only to a proposer whose proposal ha[d] been certified as responsive." [4] According to Department regulations,

> The district *shall* certify a proposal as nonresponsive if
>
> (A) it does not materially conform to the request for proposals;
>
> (B) it contains a material alteration or erasure which has not been initialed by the proposer; or
>
> (C) the proposer omits or is unwilling to provide services specified in the request for proposals.[5]

The requirement that all bids be certified as responsive before being considered is well founded. "In order to promote honest competition on an equal basis, the [district] is required to reject bids which vary materially from the specifications set forth in the publicized request for proposal." *McBirney & Assocs. v. State,* 753 P.2d 1132, 1136 (Alaska 1988) (citations omitted).[6] The quoted regulation reflects the directive that "[a] material variance from a bid specification requires rejection of the bid." *Chris Berg, Inc. v. State, Dep't of Transp. & Pub. Facilities,* 680 P.2d 93, 94 (Alaska 1984) (citation omitted). In regard to determining what constitutes a material variance, we have previously enunciated a qualitative standard: "A variance is material if it gives the bidder a substantial

advantage over the other bidders and thereby restricts or stifles competition." *Id.* Further, our standard of review in this context is deferential. "The determination by a public agency of the responsiveness of a bid is within the agency's discretion, subject, on judicial review, to an ascertainment that there was a reasonable basis for the agency's action." *Id.*[7]

With this framework in mind, we now address the initial issue of whether Transnorth's proposal was "nonresponsive." Specifically, Foundation Services claimed that Transnorth's proposal was fraudulent and nonresponsive because it was submitted by Lela Brown as "President" of Transnorth, a designation contradicted by Transnorth's 1991 biennial report on file with the state.[8] Relying on the 1991 biennial report, Foundation Services also claimed that Transnorth misrepresented the true identity of its owners in its proposal. Foundation Services similarly noted that Transnorth failed to file a later biennial corporate report and failed to pay its corporate taxes, both of which were due on January 2, 1993.[9] Such failures, according to Foundation Services, demonstrated that Transnorth's proposal was nonresponsive insofar as it was not a corporation in "good standing." Additionally, Foundation Services asserted that the Browns, in their individual capacities, and Transnorth, in its corporate capacity, had failed to perform previous public contracts and that both indi-

---

4. 4 AAC 27.085(f)(1).

5. 4 AAC 27.085(e)(2) (emphasis added). Additionally, 4 AAC 27.085(e)(3) provides:
   The district *may* certify a proposal as nonresponsive if
   (A) the proposer failed to render substantial performance of a pupil transportation contract with any school district within the state within the previous three years; or
   (B) the district cannot assure itself that the proposer will provide the specified service.
   (Emphasis added.)

6. *Cf. Kelly v. Zamarello,* 486 P.2d 906, 918 (Alaska 1971) ("[P]ublic policy requires carefully drawn public competitive bidding standards and strict compliance with those standards.").

7. *See also Kelly,* 486 P.2d at 918 ("Applying the reasonable basis standard, we cannot say that the finding of nonresponsiveness lacked either sub-

stantial support in the record or a reasonable basis in law.").

8. Transnorth's proposal listed Lela Brown as "President" and Nathan Brown as "Secretary/Treasurer" of Transnorth.

9. *See* AS 10.06.805, 10.06.811, 10.06.815, 10.06.845(a). Together, these provisions required Transnorth, as a domestic corporation, to file a biennial report and to pay a $100 corporation tax by January 2, 1993. The penalty for failing to timely pay the tax is $25, and the penalty for failing to timely file the biennial report is ten percent of the amount of the corporation tax. Thus, by failing to file its biennial report and pay its $100 corporation tax, Transnorth's tax and penalty liabilities totaled $137.50 [($100 + $25 penalty) + (.10 × $125)], a $37.50 increase over its liability had it timely paid its corporation tax and filed its biennial report.

viduals and the corporation were currently engaged in litigation—facts which, if true, were omitted or misrepresented in Transnorth's proposal. We now consider Foundation Services' assertions in turn.

As already discussed, the superior court viewed as dispositive the fact that Transnorth had failed to timely file its biennial report and pay its corporate taxes and that its 1991 biennial report contradicted information contained in its proposal. Both the District and the Department acknowledge Transnorth's failure. However, both take the position that this failure does not render Transnorth's proposal nonresponsive. In short, Transnorth's failure raises two relevant inquiries: (1) was Transnorth's proposal fraudulent, and (2) did Transnorth gain a material advantage over Foundation Services by not filing its biennial report or paying its corporate tax?

Transnorth's 1991 report listed an out-of-state trust as the sole owner of Transnorth; similarly, it did not list either of the Browns as officers of the corporation. However, it is entirely possible that during the interim period—1991 to 1993—the ownership and officer status of Transnorth changed.

In support of its assertion that the Browns were not officers or owners of Transnorth, Foundation Services relies entirely on Transnorth's outdated 1991 biennial report. However, in its March 16, 1993 response to Foundation Services' Petition for Reconsideration, Transnorth attached an affidavit from Lela Brown that confirmed under oath her status as "President" as well as Nathan Brown's status as "Secretary/Treasurer" of Transnorth. Furthermore, the record shows that on May 17, 1993, Transnorth paid its corpo-

rate tax and filed its 1993 biennial report, which contained information consistent with its proposal. (As noted previously, the Department approved the transportation contract entered into between LKSD and Transnorth on June 1, 1993.) Since Foundation Services' claim that the Browns were not officers of Transnorth rests entirely on an outdated document, Transnorth provided the only relevant evidence on this issue, evidence which is consistent with its proposal. Consequently, Foundation Services' claim of fraud has not, on this record, been made out.[10]

Even if not fraudulent, Transnorth's failure to file its report and pay its taxes could still render its proposal nonresponsive if it received a "substantial advantage" over Foundation Services as a result of these failures. *Chris Berg,* 680 P.2d at 94. The superior court focused on this aspect of the case.[11]

> If one contractor asserting the status is allowed to ignore the requirements of law such as the payment of corporate taxes and the filing of documents indicating the officers, directors, and owners of the corporation, then such entity obtains an unfair advantage over its competitors.

We conclude that the superior court erred: Transnorth's failure to pay its $100 corporate tax and file its biennial report did not provide it with a substantial advantage over Foundation Services. In essence, the biennial report is a filing requirement and the tax, by any measurement, is nominal. In *King v. Alaska State Housing Authority,* 512 P.2d 887 (Alaska 1973), this court affirmed a superior court's holding that a party's proposal was responsive notwithstanding its failure to timely file a $6,300 deposit. *Id.* at 892–93. Common sense suggests that Transnorth's

---

10. Foundation Services' claim that Transnorth misrepresented the identity of its true owners is unpersuasive. At issue is one of the questions contained in the district's bid proposal. It states:
    Provide the names and mailing addresses of the owners, *or if applicable,* principles of corporations of the proposers. Include resumes of key management personnel.
    (Emphasis added.) In response, Transnorth listed "Nelson & Lela Brown." Given the inartful wording of the question coupled with the Browns' status as "principals," Transnorth's failure to list the name of its out of state majority owner is not necessarily fraudulent.

11. In its original decision, the superior court indicated that Transnorth, as a corporation not in compliance with filing and tax requirements, was incapable of entering into contracts ("Nothing in the record indicates that Transnorth Corporation was a valid Alaska corporation at the time it signed the contract with LKSD or at the time the Department of Education approved the contract."). However, on reconsideration, the superior court retreated from this position and stated that "[t]he court did not intend to imply that Transnorth lacked authority as a corporation to act as a corporation."

failures to file the required biennial report and to pay the $100 tax did not provide it with a significant advantage over Foundation Services. In short, as the District argues, "there is ... no authority to support the [s]uperior [c]ourt's premise that Transnorth could not be a responsive bidder or proposer on a public contract on January [15], 1993, because, at that time, it was [two weeks] late in filing its 1993 biennial report and paying its 1993 biennial corporation tax."

Foundation Services additionally claims that Transnorth's proposal was fraudulent and nonresponsive for the following reasons: (1) the Browns and Transnorth had failed to perform on previous public contracts, and (2) the Browns and Transnorth were currently engaged in other litigation.[12] However, the superior court did not rely on those arguments.

Concerning the charge of a previous failure to perform on public contracts, the "failure" alleged was a breach of a lease agreement with the City of Bethel. Notwithstanding the question of whether the lease contract was a "public contract," the failure related to the Browns in their individual capacities, not to Transnorth. Foundation Services' claims regarding current litigation also fail. First, some of the litigation referred to involved the Browns individually. Foundation Services also referred to two mid–1980s judgments totaling approximately $6,000 against Transnorth. Again, any claim of fraud can be rejected on the basis that what we have is an accurate answer to a confusing question; that is, what constitutes "current litigation?" In any event, insofar as Transnorth's claims were detailed in its petition for reconsideration, both the District and the Department were fully aware of Transnorth's purportedly fraudulent responses.

In summary, given the applicable standard of review—"reasonable basis"—we hold "that the superior court erred in substituting its judgment for that of the [District] as to the finding that the bids were nonresponsive." *State v. Bowers Office Prod., Inc.*, 621 P.2d 11, 13 (Alaska 1980) (*"Bowers I "*).

## B. The Department Did Not Abuse Its Discretion in Approving the Contract between the District and Transnorth.

██ Alternatively, Foundation Services argues that the Department abused its discretion in approving the contract. In agreeing with Foundation Services, the superior court stated:

> By ignoring Transnorth's failure to qualify as a corporation in good standing with the state, the Department of Education abused its discretion.

Furthermore, the superior court held that the Department was required to, but did not, take a "hard look" at the "problems raised about Transnorth and its principals, the Browns" (citing *Alaska Survival v. State, Dep't of Natural Resources*, 723 P.2d 1281, 1287 (Alaska 1986) (affirming the department's land lottery after holding that agency's review of new information was not arbitrary or unreasonable)).

As the parties and superior court correctly note, we review the Department's approval of Transnorth's contract under an abuse of discretion standard.[13] That is, "[w]here, as here, the question is as to the merits of agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion." *Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548 (Alaska 1983) (citation omitted). To this effect, as the superior court noted, "[w]here an agency fails to consider an important factor in making its deci-

---

12. These allegations stem from answers given by Transnorth in its proposal. Specifically, Transnorth denied that it had "failed on one or more public contracts" and replied in the negative to the question whether it was "currently involved in any litigation."

13. *King*, 512 P.2d at 894 ("The parties agree that [the agency's] evaluation and selection of redevelopment proposals can be set aside for abuse of discretion.... Under this standard of review, this court should not second-guess reasonable evaluations of complex housing criteria with which the agency is intimately familiar.").

sion, the decision will be regarded as arbitrary." *Id.* at 548–49 (citation omitted).

We begin our analysis by noting that the applicable regulation provides the Department with little guidance in its review of contracts submitted by a school district. In fact, except for stating that the commissioner shall act within fifteen days after receipt of the proposed contract, the regulation, 4 AAC 27.085(h),[14] merely states that the commissioner may require justification of rates and may require that a performance bond be posted. The regulation is silent as to what factors, if any, the commissioner should consider in evaluating a contract. The only regulatory directive the commissioner had was whether the proposal was "in the best interest[s] of the district." 4 AAC 27.085(f)(1)(B).

Turning to the superior court's decision, it held that the Department's review of the contract was inadequate:

> Transnorth's failure to correct its corporate noncompliance in light of the other serious allegations of the Browns' financial difficulties should have caused the Department of Education, as a trustee of public money, to seriously investigate both Transnorth's corporate status and the Browns' financial entanglements. Nothing in the record indicates any effort on the part of the department to probe into the financial integrity of a corporation in non-compliance with the State law and its principals, the Browns, before approving the contract between LKSD and Transnorth. There is

no evidence in the record that the department did anything more than review LKSD's decision making process.

Our review of the record indicates otherwise. As previously mentioned, the Department's approval of Transnorth's proposal came after a project manager had reviewed copies of all pertinent documents. Additionally, since Transnorth's failure to file its biennial report and pay its corporate taxes do not render its bid nonresponsive, the Department could overlook these technical flaws. Furthermore, we have previously deferred to an agency's or district's oversight in analogous contexts.[15] Finally, insofar as the record indicates that the Department's formal review may have been limited to a two-page memo, an absence of more detailed findings is not necessarily fatal.[16]

Given the District's and the Department's review and the deferential standard employed when reviewing an agency's discretionary decision, we conclude that the Department had a reasonable basis for its determination that it should award the contract to Transnorth. Further, we conclude that the Department's actions were not arbitrary or capricious as to Foundation Services.

## IV. CONCLUSION

In awarding the transportation contract to Foundation Services, the superior court erred in two respects: (1) it incorrectly held

---

**14.** 4 AAC 27.085(h) states:

After district school board action to offer a transportation contract, and following any board actions on petitions for reconsideration by proposers, the district school board shall forward a copy of the proposed contract, successful proposal, and minutes containing board actions to the commissioner.... The commissioner may require justification of rates. The commissioner shall act within 15 days after receipt. Upon approval by the commissioner, the district school board may award the contract. As a condition of his approval, the commissioner may require a performance bond of the contractor....

**15.** *See Fairbanks N. Star Borough Sch. Dist. v. Bowers,* 851 P.2d 56, 59–60 (Alaska 1992)

(*"Bowers II "*) ("[N]otwithstanding some flaws, there *is* a reasonable basis for the school district's award.... In light of the broad discretion granted to school districts regarding procurement decisions under AS 14.14.060(h), we conclude that the superior court did not afford proper deference to the decisions of the school district."); *State v. Northern Bus Co.,* 693 P.2d 319, 322 (Alaska 1984) ("Northern Bus argues that investing DOE with such broad discretion [under 4 AAC 27.085(e)(2) ] fails to recognize the necessity of considering non-monetary factors such as safety, facilities and equipment. We disagree.").

**16.** *Bowers II,* 851 P.2d at 60 (stating that a school district's implicit findings were acceptable in support of its determinations).

that Transnorth's proposal was nonresponsive, and (2) it incorrectly held that the Department of Education abused its discretion in approving the contract. For these reasons, the superior court's decision reversing the Department's contract award to Transnorth is REVERSED.[17]

---

17. Given our disposition, we need not reach the question of whether the superior court should have remanded the case to the Department rather than award the contract to Foundation Services.