AREA G HOME AND LANDOWNERS ORGANIZATION, INC. (HALO), Daniel E. Stone, Warren Olson, and James M. Crawford, Appellants,

v.

ANCHORAGE, a Municipal Corporation, Appellee.

No. S–7731.

Supreme Court of Alaska.

Nov. 22, 1996.

Richard A. Weinig, Pletcher, Weinig, Moser & Merriner, Anchorage, and Allan E. Tesche, Russell, Tesche & Wagg, Anchorage, for Appellants.

Bruce E. Gagnon and Neil T. O'Donnell, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Kenneth G. Robertson, Robertson, Edgren & Christensen, LLC, Anchorage, for Amicus Curiae James Ricks.

Claire Steffens, Law Offices of Claire Steffens, Anchorage, for Amicus Curiae O.W. Lowe, Jr.

Andrew M. Hemenway, Anchorage, for Amicus Curiae Chugiak–Eagle River Chamber of Commerce.

Cynthia Strout, Anchorage, for Amicus Curiae The Girdwood Board of Supervisors.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

### I. INTRODUCTION

The Area G Home and Landowners' Organization, Inc. and three taxpayer-citizens (HALO, collectively) appeal the superior court's dismissal of their lawsuit. Their suit sought to prevent the Municipality of Anchorage (Municipality) from creating a new police service area that would include the area of southeast Anchorage called the Hillside. HALO alleges that in creating the new service area, the Municipality violated its own charter and ordinances as well as the equal protection guarantees in the state and federal constitutions. We affirm the superior court's decision in favor of the Municipality.

### II. FACTS AND PROCEEDINGS

The Municipality was incorporated as a unified municipality[1] in September 1975, when voters adopted by referendum its constitutional document, the Home Rule Charter for the Municipality of Anchorage (Charter). The Municipality united the previously separate cities in the Greater Anchorage Borough.

The Alaska Constitution and the Charter provide for the creation of "service areas" within the Municipality. Residents of a service area receive specific services, such as fire or police protection, and are taxed accordingly. Alaska Const., art. X, § 5; AS 29.35.450; Charter, art. IX, § 9.01; North Kenai Peninsula Road Maintenance Serv. Area v. Kenai Peninsula Borough, 850 P.2d 636, 639 (Alaska 1993). Ordinances presently in effect define over thirty-five service areas within the Municipality to provide for services such as police protection, fire protection, road maintenance, drainage, parks and recreation, and solid waste disposal. Anchorage Municipal Code (AMC) 27.30.010–.610 (1996).

The Charter states twice that a service area may be created or altered only by vote "within the area affected." The section entitled "Service areas" provides:

> (a) A service area may be created, altered, or abolished only with the approval of a majority of those voting on the question within the area affected....

1. A unified municipality, as defined under Alaska law, is "a single unit of home rule government" that unites "[a] borough and all cities in the borough." AS 29.06.190. A unified municipality is formed under a unification charter. AS 29.06.190–.410. The charter must be drafted by an elected commission and then ratified by voters in certain combinations that ensure popular approval both in and out of the borough's cities. AS 29.06.270, .360. Upon ratification, the charter "operates to dissolve all municipalities in the area." AS 29.06.370.

(b) The assembly by ordinance shall adopt procedures for creating, altering, abolishing and operating service areas.

Charter, art. IX, § 9.01(a) and (b). In addition, a section designated as a "Bill of Rights," provides:

This Charter guarantees rights to the people of Anchorage that are in addition to rights guaranteed by the Constitution of the United States of America and the Constitution of the State of Alaska. Among rights guaranteed by this Charter are:

. . . .

(2) The right of immunity from the creation or alteration of a service area, except upon a vote within the area affected.

Charter, art. II.

The Anchorage Police Department (APD) serves the Anchorage Police Service Area (APSA), which encompasses a large portion of the Municipality.[2] However, APSA does not include the Hillside, an area in southeast Anchorage that is bordered on the west by the New Seward Highway, on the north by O'Malley and Abbott Roads, and on the south by Potter Drive.

The Hillside is a residential area that has grown from a population of approximately 2,500 in 1975 to approximately 25,000 now. It is relatively affluent; according to Mayor Rick Mystrom, its voting population is approximately ten percent of Anchorage's, but its residential property value comprises seventeen percent of the Anchorage total.

Hillside residents do not pay for APD police service. Instead, they rely on Alaska state troopers for protection. However, Hillside residents benefit from APD services. APD provides emergency services and investigates major crimes in the Hillside. APD polices roads that border the Hillside and public institutions, such as Service High School, within the Hillside. About thirty APD officers reside in the Hillside and drive their patrol cars home, providing a limited patrol service for the Hillside. Many city-wide services provided by APD benefit Hillside residents. Those services include the 911 system, specialized units such as the bomb squad, and what the Municipality calls "safe city" functions. Safe city functions are programs designed to benefit all Anchorage residents and include crime prevention education, municipal prosecution, jail cells, patrols for safer recreation and shopping areas, and measures to reduce drunk driving.

The boundaries of APSA have not been static. Previous expansions of APSA, to include the neighborhoods of Eagle River/Chugiak, Muldoon/Sand Lake, Dimond Industrial Park, Ocean View/Klatt, Glenn Heights, South–East Midtown, Basher/part of Bicentennial Park, Abbott/O'Malley, and Independence Park, were approved by the separate votes of residents of the new areas to be added. Hillside voters have rejected expansion of APSA into their neighborhood on three occasions.

On February 13, 1996, the Anchorage Assembly passed AO 96–30(S). That ordinance placed two propositions on the April 1996 ballot. The first, Proposition 13, provided for the abolition of APSA. Only residents within the existing APSA could vote on it. However, it was contingent on passage of the second proposition, Proposition 14. Proposition 14 provided for the creation, effective January 1, 1997, of a new Anchorage Police Service Area (NAPSA) consisting of the old APSA plus the Hillside. Proposition 14 also stated that "[t]he new police service area would succeed to all of the assets and liabilities, including bonded indebtedness, of the Anchorage Police Service Area." All residents within the boundaries of NAPSA could vote on the second proposition. Thus AO 96–30(S) offered a mechanism to expand APSA to include the Hillside without a separate vote by Hillside residents.

The April 1996 ballot also included Proposition 6, which authorized $900,000 in bonds to purchase APD police cars. That proposi-

---

**2.** AMC 27.030.130 defines APSA as

the areas formerly known as the City of Anchorage, the Spenard Service Area of the Greater Anchorage Area Borough, the Muldoon–Sand Lake Area, the Dimond Industrial Park Area, the Oceanview–Klatt Area, the Basher Area and a portion of the Far North Bicentennial Park, the Southeast Midtown Area, the Independence Park and surrounding area, Section 16, except Boling Subdivision, and the Eagle River–Chugiak Area.

tion stated that the bonds will be paid by property taxes within APSA and guaranteed by the Municipality. Local law requires service area bonds to receive "dual majority" approvals from the voters who will be primarily liable for them and the voters who will guarantee them. AMC 06.20.020(A). Therefore, Proposition 6 had to pass both among APSA residents and among all voters in the Municipality. Hillside residents did not vote as APSA residents on Proposition 6. However, if Propositions 6, 13, and 14 all take effect, Hillside residents will be assessed for property taxes on the $900,000 debt after January 1, 1997, under the "assets and liabilities" clause of Proposition 14.

Before the election, HALO brought suit. HALO alleged that AO 96–30(S) violated (1) the "area affected" provisions in the Anchorage Municipal Code and the Charter and (2) the equal protection clauses of the Alaska and United States Constitutions. It sought declaratory and injunctive relief.

The superior court ruled that HALO was not entitled to a preliminary injunction. In particular, the court found that the voting scheme in AO 96–30(S) rested on a correct determination of the areas affected by Propositions 13 and 14:

> Giving the appropriate [deference] to legislative action, a review of the totality of the information before the Assembly reveals that the Assembly had a reasonable basis to conclude that all Anchorage voters will be subject to significant change in cost, quality, and quantity of police service if a citywide police service area is created.
>
> The change will affect the tax burden in the old, as well as the new[,] police service area. It will affect the quality of service and its cost throughout the city. It will affect the scope, consistency, and uniformity of delivery of police services citywide to all Anchorage residents. It may affect the quality of police services citywide.

However, the court ordered that the votes of the Hillside be counted separately in case HALO prevailed in a permanent injunction hearing.

In the April 26 election, Proposition 6, the $900,000 levy, passed in APSA by a vote of 19,889 to 17,636, or 53% in favor. It passed area-wide by 22,497 to 21,957, or 50.6% in favor. Proposition 13, to abolish APSA, passed in APSA by a vote of 26,935 to 10,190, or 73% in favor. Proposition 14, to create NAPSA, passed in the proposed NAPSA (APSA plus the Hillside) by 28,573 to 14,510, or 66% in favor. Hillside residents strongly opposed Proposition 14 by a vote of 5,095 to 1,460, or only 22% in favor.

In July 1996 the court granted summary judgment in favor of the Municipality and issued an order of final judgment. On appeal, HALO makes four arguments. First, HALO claims that the Charter did not give the Anchorage Municipal Assembly (Assembly) the power to expand APSA to include the Hillside without a separate vote of Hillside residents. Second, HALO argues that if the Assembly had the power to expand APSA into the Hillside, the Assembly did not follow correct procedures because it did not make adequate findings of fact. Third, HALO asserts that AO 96–30(S) violates the guarantees of equal protection under the Alaska and United States Constitutions. Finally, HALO also claims that Proposition 6 violates laws requiring residents to accept responsibility by vote for public debt.

## III.   STANDARD OF REVIEW

Questions of law decided by the superior court on summary judgment are reviewed by this court *de novo*. *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1317 n. 7 (Alaska 1994).

HALO asks us to determine whether the Assembly's actions were consistent with the Municipal Charter. Because the Municipal Charter is a constitutional document, HALO's claims raise constitutional questions of law to which we apply our independent judgment. *ARCO Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992).

HALO also asks us to determine whether the Assembly made adequate factual findings when it adopted AO 96–30(S). We have noted that "[f]actual determinations made by a municipal legislative body with respect to local electoral processes are … entitled to deference when reviewed by a court." *Kentopp v. Anchorage*, 652 P.2d 453, 459 (Alaska

1982). In *Kentopp,* we suggested that the appropriate standard of review for such questions might be the "reasonable and not arbitrary" test. *Id.* Here, we determine that test to be the applicable standard of review.[3]

## IV. DISCUSSION

### A. AO 96–30(S) Is in Substance an Alteration of APSA to Include the Hillside.

■ The Charter permits service areas to be "created, altered, or abolished." Charter, art. IX, § 9.01(a). Pursuant to this language, the Assembly framed AO 96–30(S) so that Proposition 13 would abolish APSA and Proposition 14 would create NAPSA. Nevertheless, we look beyond the form of Propositions 13 and 14 to the substance of the process initiated by AO 96–30(S).

The Municipality designed Propositions 13 and 14 simply to alter APSA to include the Hillside. Indeed, the Municipality concedes that it chose to use two propositions because previous propositions to include the Hillside in APSA, all of which included a separate vote by the Hillside, had failed. Moreover, the Municipality explicitly linked the two propositions by drafting Proposition 13 so that it was contingent on Proposition 14. APSA would not cease to exist unless NAPSA was created simultaneously. Thus, we conclude that AO 96–30(S) initiated what was in substance an alteration of APSA to include the Hillside.

### B. The Assembly Had the Power to Expand APSA without a Separate Vote of Hillside Residents.

■ HALO contends that the Charter prohibits expansion of APSA to the Hillside without a separate vote of Hillside residents. Its argument focuses on the "area affected" provisions in the Charter, and it interprets that phrase to mean the geographical area that is added to or removed from a service area. To support this interpretation, HALO refers to the Charter's legislative history, prior Assembly interpretations of "area affected," and the language of the Charter's Bill of Rights.

The Municipality counters that "area affected" is not synonymous with the area to be added or removed. Instead, it asserts that "[i]n choosing the term 'area affected' ... Charter Commission members recognized that more than one area might be 'affected' by creation of a service area or extension of its boundaries." We agree with the Municipality.

### 1. The Charter's legislative history demonstrates that the Charter Commission intended to define "area affected" broadly.

■ We have held that when faced with ambiguous language in a legislative act, we may look to the act's legislative history as a guide to construing that language. *Dillingham v. CH2M Hill Northwest,* 873 P.2d 1271, 1276 (Alaska 1994). We recognize that statements made by legislators during legislative deliberations may be relevant evidence when a court is trying to determine the meaning of ambiguous terms. *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 176 (Alaska 1985). Thus, HALO argues that several statements made during hearings conducted by the Charter Commission support its interpretation of the Charter's "area affected" language. We disagree.

A few comments that HALO cites indicate that participants in the hearings believed that some type of vote was needed before a service area could be created or extended. For example, HALO points out that one

---

**3.** Our conclusion is consistent with case law from other jurisdictions. For example, a California court in *San Bernardino Fire & Police Protective League v. City of San Bernardino,* 199 Cal. App.2d 401, 18 Cal.Rptr. 757, 766 (1962), examined legislative action similar to the type HALO asks us to review. That court scrutinized a decision by the San Bernardino city council in which the city council fixed city employees' salaries. *Id.,* 18 Cal.Rptr. at 761. The city's charter required the city council to set the salaries in accordance with the salaries of employees with similar duties in certain other cities. *Id.* Thus, prior to setting the salaries, the city council had to make a factual determination about which employees in the other cities had similar duties to San Bernardino employees. *Id.* at 766. The court concluded that the city council's "fact finding function" was one that "preced[ed] legislative action" and would not be disturbed "in the absence of fraud or arbitrary action." *Id.*

south Anchorage resident stated that "before a new service area can be created ... it should be voted on by the people." HALO also indicates that the official pamphlet published by the Charter Commission stated that no service area would be created or extended "unless approved by the voters."

However, the meaning of those statements is ambiguous. They indicate only that individuals believed service areas should be created or extended by vote; they do not suggest what area is entitled to vote. Indeed, one individual's statement, which HALO cites, suggests that hearing participants were not primarily concerned with what area would vote when they raised concerns at the hearings about voting for service area changes. Rather, that individual indicated that the primary concern of persons attending the hearings was that they did not want the Assembly alone to be able to change service areas because they feared the Assembly would not be responsive to the wishes of the people.[4]

HALO also relies heavily upon statements made by one member of the Charter Commission. That member stated that

> [o]ne suggestion she had, which she had not yet discussed with the rest of the Charter Commissioners, would be to provide in the Charter that any area-wide service voted on would also allow the "remote" people to vote on whether or not they wished to be included in the area-wide service.

However, that member's suggestion was not adopted, and the other commissioners did not comment on it. Later in the same meeting, the member stated that

> she would still like to get some feeling from the people as to whether it is important for them that they be allowed to vote on whether they *want* to be included, before area wide services are spread to the Girdwood/Alyeska area.

Once again, the Commission did not adopt that suggestion. In fact, the record indicates that only "one person responded affirmative-

ly." Therefore, those comments do not clarify what the Commission intended "area affected" to mean.

Indeed, the best evidence of the meaning the Charter Commission intended for the term "area affected" comes from an analysis of early Charter drafts. An early draft of the service area provisions of the Charter included language incorporating the narrow, geographical definition of "area affected" urged by HALO. On April 15, 1975, the Charter Commission adopted language providing that "[a] service area may only be created, extended or abolished with the approval of a majority of those voters who reside within ... the area to be created, extended or abolished."

However, the Charter Commission specifically rejected that language on May 3, 1975, when it amended the April 15 provision. The amended provision stated that "[a] service area may be created, extended, or abolished only with the approval of a majority of those voting on the question within the area affected." Except for the substitution of the word "altered" for "extended," that language remained undisturbed throughout subsequent hearings by the Commission.

In interpreting legislative history, courts have concluded that "[t]he rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1530 (9th Cir.1995). In particular, the United States Supreme Court has held that where a legislative body "includes limiting language in an earlier version of [an act] but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983).

Thus, we conclude from the Charter's legislative history that the Charter Commission did not limit the term "area affected" to only the geographic area into which services would be extended. Rather, we conclude

---

**4.** That individual testified at the hearings "that she feels that the people *only* should vote.... She *doesn't* feel that public hearings and then having the assembly make the decision is good enough—it can't tell what a majority wants."

that the Charter Commission recognized that areas other than the one into which services would be extended might be affected by a decision to alter a service area.

### 2. Prior interpretations of the term "area affected" by the Assembly do not establish the meaning of that term.

HALO also argues that prior Assembly interpretations of the Charter's provisions mandate a conclusion that "area affected" means the geographical area to be added to or removed from a service area. HALO correctly points out that the Assembly expanded APSA several times prior to 1995, and each of those actions involved a separate vote by the area to be added. It suggests that we may infer from those actions that the Assembly determined on each occasion that the term "area affected" in the Charter referred to the area to be added to or removed from a service area. For example, the record indicates that when APSA was expanded to include the "Southeast Mid–Town Area," the Assembly permitted only residents of the Southeast Mid–Town Area to vote. Although the Assembly made no express conclusions about the "area affected" by that expansion, HALO appears to argue that the Assembly's actions should bar it from defining "area affected" more broadly in the current Hillside case. This argument amounts to an assertion that prior Assembly actions, such as the one involving the Southeast Mid–Town Area, were accompanied by implied constructions of "area affected" by the Assembly that should impact our decision about the meaning of that term.

Many courts have concluded that a legislature's construction of ambiguous constitutional provisions may be probative of the constitution's meaning. See, e.g., Davis v. City of Berkeley, 51 Cal.3d 227, 272 Cal.Rptr. 139, 148, 794 P.2d 897, 906 (1990) (stating that a legislature's interpretation is entitled to deference). However, courts recognize that the judicial branch remains the final arbiter of what a constitutional provision means. E.g., Utah County v. Intermountain Health Care, Inc., 709 P.2d 265, 268 (Utah 1985).

We agree with HALO that prior, consistent interpretations by the Assembly of "area affected" may be probative of that term's meaning. Reference to the Assembly's interpretation of "area affected" is particularly appropriate in this case because the Charter delegates to the Assembly the power "to establish·procedures for creating, altering, or abolishing service areas." Charter art. IX, § 9.01(b). And the parties do not dispute that this delegation includes the power to define "area affected" for the purposes of determining who is entitled to vote on a particular change to a service area.

However, we disagree with HALO that Assembly actions made in conjunction with past changes to APSA provide a complete picture of the Assembly's prior construction of "area affected." Our review of the record reveals a critical determination by the Assembly that clarifies how the Assembly construed that term. In 1979, the Assembly enacted AMC 27.10.010(A), which defines "area affected." The Assembly was prompted to enact that ordinance when it noted the ambiguity of the "area affected" language in the Charter. A January 9, 1979 Assembly Memorandum, AIM 4–79, signed by Municipal Attorney Theodore Berns and Mayor George Sullivan, concluded that "the term 'area affected' ... does not have any independent legal definition, but is instead subject to reasonable definition by the Assembly in the form of a legislative finding."

A second memorandum dated March 12, 1979 and signed by Municipal Attorney Berns and Assistant Municipal Attorney Thomas Klinkner again noted potential ambiguity in the "area affected" language of the Charter. That memorandum concluded that the meaning of "area affected" was potentially ambiguous in the case of an alteration of a service area. It noted two possible meanings for the term:

1. The area affected is the area that will gain or lose a service as a result of the ... alteration ... of the service area.

2. The area affected is the area described under (1) above, plus any other area whose tax rate will be changed substantially by the ... alteration ... of a service area.

The memo concluded that

to resolve all doubts as to the meaning of the term "area affected[,"] further legisla-

tion would be necessary. An amendment to Title 27 [of the Municipal Code], adopting one or the other of the two interpretations proposed above, would be most helpful to foreclose future disputes as to the meaning of the term.

Shortly thereafter, ordinance AO 79–156 was adopted, apparently as a response to the concerns raised in the two Assembly memoranda. That ordinance, now codified at AMC 27.10.010(A) defined "area affected" as "that area determined by the Assembly to be subject to significant change in the cost, quality, quantity, or other factor affecting the delivery of service therein if the proposed action is approved." AO 79–156. Because this ordinance adopts language referring to a "significant change in cost," it appears that the Assembly endorsed the second, more expansive, definition of "area affected" proposed in the March 1979 memo, which included not only the area where services change but also the area where taxes change significantly.

In light of our decision that a legislative determination of an ambiguous constitutional term may be relevant evidence of a constitution's meaning, we conclude that the Assembly's choice of the broader definition of "area affected" provides additional support for our conclusion that the Charter's legislative history demonstrates an expansive meaning of that term.

### 3. *The Charter's Bill of Rights does not clarify the definition of "area affected."*

Finally, HALO asserts that the Charter's "Bill of Rights" supports its interpretation of "area affected." The Bill of Rights provides that "[a]mong the rights guaranteed by this charter are . . . [t]he right of immunity from the creation or alteration of a service area, except upon a vote within the area affected." Charter, art. II.

However, the Official Commentary to the Charter undermines HALO's reliance on this provision. It expressly states that the Bill of Rights is "intended as a synopsis of substantive rights granted in the remainder of the Charter. It is not intended to expand or modify the rights in question as they are stated in other parts of the Charter." Moreover, the Bill of Rights provides no guidance about whether "area affected" has a narrow meaning, as urged by HALO, or a broader one.

Thus, despite HALO's arguments relating to the Charter's legislative history, the Assembly's prior interpretations of "area affected," and the language of the Charter's Bill of Rights, we conclude that the meaning of "area affected" is broader than the geographical area to be added to or removed from a service area.[5] Therefore, we conclude that the Assembly had the power to determine that all persons living in APSA and the Hillside were within the area affected by AO 96–30(S), even though that determination would mean that residents of the Hillside would not be permitted to approve NAPSA by a separate vote.

### C. *The Assembly Made an Adequate Factual Finding that the Residents of NAPSA Were within the Area Affected by AO 96–30(S).*

■ The next issue before us is whether the Assembly followed correct procedures in adopting AO 96–30(S). As indicated previously, AMC 27.10.010(A) defines the procedures the Assembly must follow to create, alter, or abolish a service area. That ordinance states that the "area affected" by an alteration of a service area is "that area determined by the assembly to be subject to significant change in the cost, quality, quantity or other factor affecting the delivery of service therein if the proposed action is approved." AMC 27.10.010(A). Thus, both parties agree that in order to determine what areas would have the right to vote on the

---

**5.** The dissent relies upon language in Article IX, Section 9.01(a) of the Charter that refers to situations where "no qualified voter resides within the area." Dissent at 740–741. This provision does not undermine our conclusion. The size of the "area affected" depends upon the particular effects of a proposed service area change. In some cases, both the original service area and the area to be added will be "affected." In other cases, only the area to be added will be "affected." Although in the latter instance, the language cited by the dissent would control, it does not follow that an original service area could never be "affected" by an addition to that area.

alteration of APSA, the Assembly first had to determine what areas would be subject to a "significant change" in some "factor affecting the delivery of service" in that area. Only then could the Assembly determine that the residents of that area would be entitled to vote.

The Municipality contends that we may infer that the Assembly reasonably concluded that APSA was within the area affected by AO 96–30(S). It asserts that "[t]he refusal of the Hillside voters to join [APSA] was of such significance that it had come to be known as the 'Hillside police problem.'" To demonstrate that the Assembly determined that APSA was within the area affected, the Municipality argues that AO 96–30(S) "was simply the culmination of a series of proposals considered by the Assembly beginning in December 1995 that dealt with the Hillside police problem." It concedes that the final ordinance in that series of proposals, AO 96–30(S), did not contain express legislative findings.[6] However, the Municipality maintains that its findings relating to AO 96–30(S) may be inferred from the findings accompanying prior proposals in the series aimed at resolving the Hillside police problem.

HALO, on the other hand, argues that we may not look to prior, unenacted ordinances to infer that the Municipality made required findings. Rather, it maintains that the Assembly never determined that APSA was within the area affected by AO 96–30(S). To support its argument, HALO cites three sources. The first, a treatise, concludes that "statements made by persons in favor of a rejected or failed bill are meaningless and cannot be used as an extrinsic aid." 2A Norman J. Singer, *Sutherland Statutory Construction* § 48.01, at 302 (5th ed. 1992). The second source states that the legislative history of one act cannot be transferred to a second, similar act. *Westlands Water Dist. v. Natural Resources Defense Council*, 43

F.3d 457, 462 (9th Cir.1994). Finally, the third source cited by HALO provides that "[t]he light shed by . . . unadopted proposals is too dim to pierce statutory obscurities." *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 492 (1968).

The authorities HALO cites are inapposite. In all three of the sources cited by HALO, the issue was whether legislative history of one statute is probative of the meaning of language in another statute. 2A *Sutherland Statutory Construction* § 48.01, at 301–02 (5th ed. 1992); *Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 462 (9th Cir.1994) (finding that although the Central Valley Project Reform Act (CVPRA) was the predecessor of the Central Valley Project Improvement Act (CVPIA), legislative history of the CVPRA was not helpful in determining whether the CVPIA was exempted from the National Environmental Policy Act); *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 492 (1968). That is not the issue in this case. We are asked to review legislative history to determine whether the Assembly made a required factual determination.

We conclude that it is appropriate to examine the entire legislative history of AO 96–30(S), including portions of the record relating to the proposals considered by the Assembly between December 1995 and February 1996. The legislative history relating to proposals other than AO 96–30(S) are relevant because all of the proposals, including AO 96–30(S), were different options relating to a single initiative to address the Hillside police issue. After reviewing the record relating to the various proposals considered by the Assembly, we are persuaded that the Assembly recognized that APSA was within the area subject to a "significant change in

---

6. The record suggests an explanation for why the Assembly did not make express findings when it chose to use the two-step process of Propositions 13 and 14. It indicates that, although the Assembly thought it might have the power to expand a service area without a separate vote of the residents of the area to be added, it was not sure. However, the Assembly was certain that when a new service area was created or abolished, the "area affected" was coextensive with the created or abolished area. Therefore, the Assembly framed the expansion of the service area as an abolition of APSA and a creation of NAPSA. In light of this conclusion, the Assembly apparently thought it would have been redundant for it expressly to find that the "area affected" by Proposition 13 was APSA and the "area affected" by Proposition 14 was the area in NAPSA.

cost, quality, quantity or other factor affecting the delivery of service" if Propositions 13 and 14 passed.

The record indicates that the Assembly wanted to correct what it viewed as an inequitable tax burden falling on residents of APSA. In conjunction with the December 12, 1995 proposal, the first in the series designed to address the Hillside police issue, the Assembly specifically noted that Hillside residents substantially benefitted from the safe city functions [7] provided in APSA without having to pay for them.

An Assembly Memorandum written by the Mayor's office to accompany the December proposal clarified the problem that the Assembly was to address. That memorandum noted that "[t]he exclusion of the Hillside [from APSA] has continued to cause division between the Hillside and the rest of the Municipality since the burden of funding public safety falls inequitably on the ... people who do not live on the Hillside." The memorandum explained that "[p]olice protection services are comprised of two major elements: police neighborhood patrol and 'safe city' functions.... Although the Hillside area does not receive police neighborhood patrol from the Anchorage Police Department, Hillside residents nonetheless receive the benefits of police protection services when traveling, shopping, working and availing themselves of the cultural and recreational facilities in [APSA]." The memorandum concluded that "[a] redistribution of the cost of police protection services is not only fair and equitable but provides a just and sound method of payment for public safety."

The Assembly also received a memorandum prepared by the Budget Director on January 23, 1996 that discussed the December proposal. That memorandum highlighted the Hillside police problem and outlined the effects of taxing Hillside residents for police services. It noted that Hillside residents benefitted from safe city functions funded by residents of APSA. It stated that "[s]ince Hillside residents are not paying for the police protection benefits that they receive, the taxpayers living within [APSA] are paying *higher* property taxes than they should." In conclusion, the memorandum recommended that the Assembly adopt an ordinance that would "provide a mechanism for Hillside residents to pay their share of the Safe City function costs."

The January 23 memorandum was accompanied by a "Summary of Economic Effects" of the December proposal. The summary reiterated the perceived inequitable benefit received by residents of the Hillside as roughly equal to six percent of APSA's budget from property taxes. The summary also estimated that if Hillside residents were taxed according to the benefit they receive from the APD's safe city functions, the tax rate for residents of APSA would fall. Finally, the summary noted that the total cost for police service would not vary; the only change would be that $2.2 million of the cost of safe city functions would be shifted to Hillside residents.

A second Assembly proposal, which was discussed on January 2, 1996, reiterated the Assembly's conclusion that it needed to resolve the Hillside police issue "to more fairly distribute the burden of payment for safe city functions of police protection services."

We infer from these documents that when the Assembly adopted AO 96–30(S), it had concluded that APSA would be subject to "significant change" in the cost of delivering service to it. Like all of the other proposals considered by the Assembly, AO 96–30(S) shifted to Hillside residents a proportionate share of the cost of APD's safe city functions. As a result, the Assembly's prior determinations relating to APD's safe city functions were relevant to AO 96–30(S). In prior doc-

---

7. The record indicates that the Assembly defined "safe city functions" as

> not only general police protection services other than [neighborhood patrols], but also prosecution of crimes, incarceration of prisoners, DWI enforcement, traffic enforcement, criminal investigations of person and property crimes, bicycle patrol of recreational areas, juvenile crimes unit, narcotics investigations and crime prevention services.... All of these functions protect the quality of life and ensure all citizens receive the benefits of police protection services when traveling, shopping, working and availing themselves of the cultural and recreational facilities in Anchorage.

uments, the Assembly had already determined that the failure to tax Hillside residents proportionately for the APD's safe city functions negatively impacted residents of APSA. It had also already determined that charging the Hillside for its share of the safe city functions would reduce the cost of providing police service to APSA residents. Indeed, it was aware that, although the total cost for providing service to APSA and the Hillside would not change, the cost of serving APSA would drop by approximately $2.2 million.[8]

We note that AMC 27.10.010(A) states that an area is "affected" if the Assembly determines that the cost of delivering service to that area would change significantly. The focus of that ordinance is whether there would be a significant change in the cost of delivering services to an area, which in this case was APSA. As indicated above, the Assembly was aware that that cost would drop by approximately $2.2 million. This represents a "significant" change that is nearly five percent of the total APD budget. Therefore, HALO's argument is misdirected when it suggests that the focus of our inquiry might be whether the per family savings to APSA residents[9] was significant.

### D. The Assembly Did Not Violate Equal Protection by Enacting AO 96–30(S).

HALO argues that AO 96–30(S) violates the equal protection clauses of the Alaska and the United States Constitutions. HALO asserts that the ordinance violated equal protection by (1) denying Hillside voters' right to vote free from invidious discrimination and (2) by denying their right to free and effective representation through an unconstitutional gerrymander. We disagree.

HALO's equal protection claims depend upon the assumption that the Hillside area has a right under the Charter to a separate vote because it is the only area affected by AO 96–30(S). Because we have concluded that APSA was within the area affected, the Assembly correctly permitted APSA residents to vote. Thus, every voter within the area affected by AO 96–30(S) was given an equally powerful vote, and no person's right to equal protection was violated.

### E. Proposition 6 Was Not Illegal.

HALO's final argument is that Hillside residents cannot be forced to take responsibility for $900,000 in bonds that they did not accept by vote. As noted earlier, voters approved Proposition 6, which authorized up to $900,000 in general obligation bonds. Pursuant to the "dual majority" vote requirement of AMC 6.20.020(A),[10] Proposition 6 was submitted to all voters within APSA, as well as to all voters in the Municipality for a pledge of the Municipality's full faith and credit. Hillside voters participated in the area-wide vote.

HALO claims that Proposition 6 violated AMC 6.20.020(A) on the theory that Hillside residents should have been allowed to vote along with other APSA residents because Hillside residents would ultimately share responsibility for repayment of the bonds if APSA were altered to include the Hillside. HALO also claims that Proposition 6 violated article IX, section 9 of the Alaska Constitution because Hillside residents were "qualified to vote" but were not allowed to vote with APSA residents.

We disagree. The dual majority requirement in AMC 6.20.020(A) assures residents of service areas that they will not be made responsible for additional service area debt

8. HALO refers to a comment by Assembly Member Fay Von Gemmingen in which she agreed that the cost and level of police service would not change as a result of AO 96–30(S). That statement does not contradict the fact that, after AO 96–30(S) takes effect, it will cost $2.2 million dollars less to provide safe city functions to residents that live in APSA. While it is true that the cost of providing safe city services to NAPSA will not increase, $2.2 million dollars of the cost that was borne by residents of APSA prior to AO 96–30(S) will be shifted to the Hillside. Therefore,

the cost of providing service to the area known as APSA prior to AO 96–30(S) will fall.

9. The "Summary of Economic Effects" that analyzes AO 96–30(S) estimates the tax savings to APSA residents to be approximately $40 per year on a typical $180,000 home.

10. AMC 6.20.020(A) states that "[g]eneral obligation debt of service areas must receive dual majority votes."

without their separate consent. Hillside residents' participation in only the area-wide vote was consistent with the ordinance. On the date of the vote, Hillside residents were not residents of the service area. Indeed, they could not become residents of the service area until January 1, 1997, when the service area provision would take effect if approved. Therefore, Hillside residents were not entitled to vote with the residents of APSA.

■ Finally, HALO claims that Proposition 6 was misleading because Hillside residents were not told on the ballot containing Proposition 6 that they would be liable for repaying the bonds if the service area propositions passed. We disagree. The plain language of Proposition 6 states that residents of APSA would be primarily responsible for the bonds. Similarly, Proposition 14 clearly and succinctly states that "[t]he new police service area would succeed to all of the assets and liabilities, including bonded indebtedness, of [APSA]." We conclude that the propositions were not misleading. It was clear that the new bonds, if approved, would become part of the debts assumed by residents of NAPSA.

## V. CONCLUSION

We AFFIRM the superior court's decision. The Assembly had the power to expand APSA to include the Hillside without a separate vote by Hillside residents. In addition, the Assembly properly exercised its power when it enacted AO 96–30(S). There is sufficient evidence that the Assembly determined that the area affected by AO 96–30(S) included both the Hillside and APSA. Finally, the Assembly did not violate equal protection by enacting AO 96–30(S), and it did not act illegally by not permitting Hillside residents to vote with APSA residents on the ballot issue concerning bonded indebtedness for the service area.

COMPTON, Chief Justice, dissenting.

## I. INTRODUCTION

Voters residing within a substantial part of the Anchorage "Hillside" area repeatedly rejected inclusion in the Anchorage Police Service Area (APSA). Before the present controversy arose, they voted down three separate ballot propositions that would have led to their inclusion. At the urging of the Mayor, the Anchorage Municipal Assembly (Assembly), by a five to four vote, adopted AO 96–30(S), which provided the fourth opportunity for Hillside area voters to determine whether they wanted to be included in a police service area. Aware that Hillside voters overwhelmingly opposed inclusion in APSA, AO 96–30(S) also allowed voters in APSA to vote on the inclusion of the Hillside area. Despite the fact that Hillside area voters once again rejected the annexation (5,095:1,460), the measure passed on the wave of 28,573 votes from voters residing in APSA.

Before passing AO 96–30(S), the Assembly considered four "solutions" to the "Hillside problem." From consideration of the various proposals before the Assembly, several things became clear. The Municipality of Anchorage (MOA) delineates two kinds of police service: (1) police neighborhood patrols, and (2) "safe city" functions. The Mayor conceded to the Assembly that the Hillside area "does not receive police neighborhood patrol from the Anchorage Police Department," but noted that residents of that area "nonetheless receive the benefits of police protection services when traveling, shopping, working, and availing themselves of the cultural and recreational facilities in the Anchorage Police Service Area."[1] Since "most of the thoroughfares, businesses, places of employment, shopping areas and the majority of schools, cultural and recreational areas are within the police service area, the Hillside benefits from safe city functions."

Anchorage Budget Director Eugene Dusek identified APSA functions similarly. "When Anchorage taxpayers in the Police Service Area pay their taxes for police protection, the mill rate consists of two major components:

---

1. The same may be said of tourists, residents of the Mat–Su area who also work in APSA, and more to the point, residents of Rainbow, Bird, Indian, Girdwood and Portage, who reside within the unified municipality.

First Response Functions (neighborhood patrol) [and] Safe City Functions." He defined safe city functions as those which

protect the quality of life and ensure that *all* Municipal citizens receive the benefits of police protection when traveling, shopping, working and availing themselves of the cultural and recreational facilities in Anchorage.

According to Dusek it is the cost of *only safe city* functions that will be allocated to taxpayers in the area annexed.[2] "[M]ost" and a "majority" of those functions take place within the Anchorage Police Service Area, not the area annexed.

During discussions of the various proposals before the Assembly, it was clear that some members of the Assembly and the Mayor were searching for a way to force Hillside residents to pay for what was deemed their fair share of providing safe city functions. These functions are benefits to those who live outside the city and come into the city to work, shop and recreate. There was no discussion of extending any patrol into the Hillside area, or changing the current level of service provided.

The stated purpose of AO 96–30(S) was to equalize the tax burden for providing safe city functions. Mr. Dusek told the Assembly, "[i]t provides a more equitable means for all Anchorage residents to share in the costs of protecting the quality of life . . . ."

This is the general framework in which we must address the issues before this court. This case is not about whether the residents of the Hillside area of Anchorage benefit from police services provided in the Anchorage Police Service Area. They do. Rather, it is about whether procedures followed by the Assembly to recover a portion of the costs of APSA from Hillside residents were in conformity with the Anchorage Municipal Charter (Charter), the Anchorage Municipal Code (Code) and decisional law of this court.

This case raises two questions which I believe the court has decided wrongly. First, "area affected" has been redefined, in violation of the Charter. The court arrives

at a new definition by relying on legislative history that is only arguably ambiguous, and by rejecting seventeen years of Assembly interpretation of the Charter provision. Second, the court, applying this new definition of "area affected," concludes that the Assembly inferred a legislative finding that there was a "significant change" in APSA as well as the area annexed to APSA by AO 96–30(S). No such determination was ever made by the Assembly. This conclusion undermines cases decided by this court which require that legislative findings be articulated in decisional documents.

## II. INTERPRETATION OF "AREA AFFECTED"

The term "area affected" appears in the Charter and in the Anchorage Municipal Code. It has been interpreted consistently by the Assembly since the Charter was passed. The Charter, the Code and the Assembly's past interpretation all support the conclusion that Hillside voters alone must be allowed to determine whether they will be annexed to APSA.

### A. Use of "Area Affected" in the Charter

Article IX, § 9.01(a) of the Charter provides that "[a] service area may be created, altered, or abolished only with the approval of a majority of those voting on the question within the area affected. . . ." A plain reading of this language suggests that those who reside in the area to be "created, altered, or abolished" should approve the change. "[W]ithin the area affected" is defined by the service area that is to be "created, altered or abolished." In the case of alteration of a service area, those to be added or deleted should be the ones to vote.

Article IX, § 9.01 provides that if there are no qualified voters within a service area to be "created, altered, or abolished," it can be changed only "with the written consent of the owners of all real property within the area affected." This provision supports the conclusion that those making the decision on a service area alteration are the residents of an

---

**2.** I use the term "area annexed" throughout to indicate the area to be newly taxed for police service, as distinguished from the area which is already subject to APSA taxation.

area to be altered. If voters in an existing area could vote to alter service in an area where there are no resident voters, this provision would be unnecessary.

Article II, § 2 of the Charter, entitled "Bill of Rights," provides that the people of Anchorage are entitled to immunity from service area alterations, unless the people voting within the "area affected" approve such a change:

This Charter guarantees rights to the people of Anchorage that are in addition to rights guaranteed by the Constitution of the United States of America and the Constitution of the State of Alaska. Among rights guaranteed by this Charter are:

.    .    .    .    .

(2) The right of immunity from the creation or alteration of a service area, except upon a vote within the area affected.

The court downplays the importance of this language, because the Official Commentary to the Charter explains that the Bill of Rights is "intended as a synopsis of substantive rights granted in the remainder of the Charter. It is not intended to expand or modify the rights in question as they are stated in other parts of the Charter."

The language from the commentary indicates the bill of rights and other provisions of the Charter must be read consistently. While this section does not expand rights, the language reinforces the notion that the "area affected" is the area to be newly taxed. The right to immunity from creation or alteration of a service area is meaningless if "area affected" can be read as including an area whose tax burden may *decrease* by the creation or alteration of the new service area. Such a broad interpretation translates this guarantee into a nullity: an area may be protected from involuntary inclusion in a service area, unless it saves somebody else money.

The court places substantial weight on a Charter provision amended in 1975. Slip Op. at 733. It then relies on case law which holds that a statute should not be construed to include an omitted provision. But the language of the 1975 Charter provision that changed does not foreclose the interpretation

of "area affected" followed by the Assembly for the past seventeen years. The original Charter language did not include the words "area affected." The amended language substituted the phrase "the area to be created, extended or abolished," a phrase that already appears earlier in the same sentence, with the words "the area affected." No legislative history is cited to explain this change. The change alone is not enough to support the conclusion that the Charter Commissioners intended to delete "limiting" language. If the intent of the Charter Commission had been as clear as the court suggests, there would have been no need for the 1979 codification by the Assembly of the term "area affected."

The court dismisses legislative history which indicates voters and Charter Commissioners were concerned about the imposition of service areas on neighborhoods which did not want service. The court does so in part because voters were clearly concerned with leaving service area decisions in the hands of the Assembly. However, concern that the decision *not* be left to the Assembly does not preclude a conclusion that the provision was drafted also to protect areas to be annexed or newly served from the tyranny of a majority of voters in more populated areas.

The Charter's history indicates its service area provisions were intended to empower small communities within the Municipality, to allow them self-determination, and to avoid their domination by a centralized governing body. Attempts at unification were twice defeated before the successful 1975 Charter adoption. The reason for the defeat of the 1970 and 1974 charters was the "overwhelming outside city vote from those in rural areas who disliked government and did not want to pay taxes for services." Paul H. Wangness, *A History of the Unification of the City of Anchorage and the Greater Anchorage Area Borough,* 1977.

In both of the defeated charters, voters within the city approved the unification charter, but voters outside the city disapproved by a 2:1 margin. The third proposed charter won the support of outlying areas and passed. "It is doubtful that the Charter

could have been approved without a service area provision." *Id.*

Charter Commissioners also made representations to citizens in outlying areas that voting minorities in small communities would be protected by the Charter. For example, during a public meeting in Girdwood Commissioner Arliss Sturgulewski pointed specifically to the service area provisions to illustrate parts of the Charter designed to protect minority blocks of rural voters. At the same hearing Commissioner Mary Frohne stated she believed the Charter provided more protection for the people regarding services than under the practice previously followed by the Borough. Under that previous practice, the Borough required a separate vote of the residents of the area not previously receiving service.

The plain language of Charter Article II, § 2, and Article IX, § 9.01(a), demonstrates that these provisions were intended to prevent creation or alteration of a service area, with the attendant taxation of real property on voters within the less populated area, by those within the more populated area. To permit the court's result is counter-intuitive; voters within an existing taxed area surely always will vote to tax property within an area annexed if the additional revenue is for the provision of services *within the existing taxed area.* I am unpersuaded that the language of the Charter could contemplate such a result. The Assembly's attempt to codify "area affected" and its historic practice reinforce this conclusion.

### B. *Codification of "Area Affected"*

In 1979 the Assembly codified a definition of "area affected":

[T]he term "area affected" shall mean that area determined by the assembly to be subject to significant change in the cost, quality, quantity or other factor affecting the delivery of service therein if the proposed action is approved.

Anchorage Municipal Code 27.10.010(A). The court examines the legislative history of AMC 27.10.010(A) and concludes that it supports MOA's interpretation of "area affected." This determination is based on two 1979 memoranda signed by Municipal Attorney Theodore Berns which noted the potential ambiguity in the "area affected" language.

The 1979 memoranda conclude that the meaning of "area affected" in the context of alteration of a service area is ambiguous, embracing two possible meanings:

1. The area affected is the area that will gain or lose a service as a result of the ... alteration ... of the service area.
2. The area affected is the area described under (1) above, plus any other area whose tax rate will be changed substantially by the ... alteration ... of a service area.

Slip Op. at 734. The code provision as passed did not embrace explicitly either definition appearing in the 1979 memoranda. Nonetheless the court concludes that the Assembly must have meant the second of the two proposed definitions.

The legislative histories of the Charter and AMC 27.10.010(A) arguably are ambiguous. While they may point to an attempt to accommodate a variety of interests and concerns, the Charter was clearly meant to incorporate protection for less populated areas when service area decisions are made. It could not have passed otherwise. To conclude, as the court has, that the Charter Commission was paving the way for forced annexations, gives legitimacy to the claims of HALO that the government is now backing out of promises made to rural areas in 1975.

### C. *Past Interpretation of "Area Affected"*

The history of the Assembly's own interpretation of "area affected" does not support the court's conclusion. Indeed, it supports the contrary conclusion.

Excluding AO 96–30(S), there have been thirteen separate votes on police service area extensions since passage of the Charter. Ten extensions were passed by various areas of the municipality.[3] There have been three

---

**3.** The following areas have been added to the APSA: Muldoon/Sand Lake, 7/1/78; Eagle River/Chugiak, 1/1/79; Dimond Industrial Park, 7/1/79; Oceanview/Klatt, 7/1/79; Glenn Heights,

votes to extend the cost of APSA to Hillside voters, all of which failed. These previous votes on the extension of police service areas were made contingent on a "yes" vote by a majority of the voters residing in the area to be included.

Consistent past legislative interpretation should be given substantial weight by a court when construing an ambiguous term. *Smiley v. Holm*, 285 U.S. 355, 369, 52 S.Ct. 397, 400, 76 L.Ed. 795 (1932); *Kenai Peninsula Borough v. Andrus*, 436 F.Supp. 288, 291 (D.Alaska 1977), *aff'd*, 612 F.2d 1210 (9th Cir.1980), *aff'd sub nom, Watt v. Alaska*, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *Public Defender Agency v. Superior Court*, 534 P.2d 947, 952 (Alaska 1975). The Assembly's consistent interpretation has been that if a service area was to be created, or an area added to an existing service area, a separate vote was required by voters residing in the newly created or added area, and approved by a majority of those voting in that area.

It is clear that until this election, and the ensuing litigation, the Assembly consistently interpreted "area affected" as meaning the area in which service was to be created or to which service was to be extended. Indeed, that is why the Assembly went through the charade of framing AO 96–30(S) as an abolition and creation of service areas, instead of an alteration of the geographic boundaries of APSA. The Assembly believed that an alteration of the boundaries of APSA would have required the separate approval of the Hillside voters.

The court dismisses these past interpretations of the Charter, indicating that previous votes do not bind the Assembly to the interpretation that "area affected" means the area annexed. Slip Op. at 734. The court concludes that is not what the Assembly meant by "area affected," relying on the 1979 passage of AMC 27.10.010(A) and the Berns memos that preceded its passage. I cannot conclude, based on the legislative history, the language of the Charter, and the past interpretation of the Charter, that the court has reached the correct result.

### D. *No Significant Change Is Contemplated in the Delivery of Service.*

Assuming that the court has reached the correct result, and that "area affected" can be broader than the area annexed, there is still a question whether the proposed annexation of Hillside into APSA imposes a substantial change in "cost, quality, quantity or other factor affecting the delivery of service" received by residents of APSA.

The court concludes that a significant change in taxes would qualify as a "cost" under AMC 27.10.010(A). Slip Op. at 734–735. This is based on one sentence in one of the 1979 memoranda from Municipal Attorney Berns to the Assembly. In noting two possible definitions for "area affected," the second option provided "[t]he area affected is the area described under (1) above, plus any other area whose tax rate will be changed substantially by the ... alteration ... of a service area." There is no indication that the Assembly adopted Mr. Berns' definition. Even if the Assembly did adopt his definition, there is no indication it meant the word "cost," as included in the ordinance, to encompass a *reduction* in tax rates, rather than an *increase* in tax rates.

There is no evidence that the actual "cost, quality, quantity or other factor affecting the delivery of service" in the "area affected," as defined by the Assembly, will change, only that real property taxes will increase in the area annexed. AMC 27.10.010(A) expressly requires that the Assembly find a "significant

1/1/87; Bicentennial Park, 1/1/94; Southeast/Mid Town, 1/1/94; Basher/Far North, 1/1/94; Independence Park, 1/1/94; Section 16, 1/1/95.

The court acknowledges that prior consistent interpretations by the Assembly may be probative of that term's meaning. The court finds such a construction "particularly appropriate" here where the Charter gives the Assembly the power to establish the procedures for altering a service

area. Slip Op. at 734. The court then dismisses this argument, based on the 1979 memo from Municipal Attorney Berns, discussed above. However, the Assembly has continued to place the same interpretation on the term "area affected" in the seventeen years since that memo was submitted to the Assembly, and since the passage of AMC 27.10.010(A). Most of the service area extension votes were taken after the codification by the Assembly of the term "area affected."

change in the cost ... affecting the delivery of service" before an area can be included in the "area affected." The MOA has not demonstrated any change in cost affecting the delivery of service. Memoranda before the Assembly demonstrated that the police budget will not change, nor will services change. The only change will be a shifting of the revenue source for the police budget, which is not a cost affecting the delivery of service.[4] Despite this, the court concludes that the Assembly must have inferred a significant change in cost affecting the delivery of services within APSA. Such a conclusion is not supported by anything in the record.

## III. LACK OF DECISIONAL DOCUMENT

Assuming again that the court is correct about the scope of "area affected," and that a shifting tax burden is a "cost" under the municipal code, this case must still be remanded for appropriate legislative findings by the Assembly.

The MOA concedes that the Assembly did not produce a decisional document setting forth legislative findings which might support a determination that there will be significant change in "the cost, quality, quantity or other factors affecting the delivery of service within" APSA and the area to be annexed. Slip Op. at 736. Indeed, the Assembly made no determination at all. Despite this flaw, the court concludes that it can cobble together bits and pieces of select information from which it can infer that the Assembly could have made findings which might support the requisite conclusion.[5] These bits and pieces

of information are from documents and testimony that were presented to the Assembly not only with regard to AO 96–30(S), but from proposed ordinances that were rejected by the Assembly.

### A. The Law Requires a Decisional Document.

Judicial review of action taken by an administrative body is to ensure that the body "has given reasoned discretion to all the material facts and issues." Southeast Alaska Conservation Council v. State, 665 P.2d 544, 549 (Alaska 1983) (citation omitted). If an important factor is not considered, a decision is regarded as arbitrary. State v. 0.644 Acres, More or Less, 613 P.2d 829, 833 n. 13 (Alaska 1980). This review is facilitated by decisional documents which set forth the basis for an administrative body's actions.

This court consistently has stressed the importance of decisional documents when asked to review action taken by an administrative body. Trustees for Alaska v. State, 795 P.2d 805, 809 (Alaska 1990) (the facts and premises on which a best interests determination is based should appear in Department of Natural Resources' decisional document); Alaska Survival v. State, 723 P.2d 1281, 1287 (Alaska 1986) (decisional document should disclose that the agency has taken a hard look at factors, and engaged in reasoned decision making); Ship Creek Hydraulic Syndicate v. State, 685 P.2d 715, 717 (Alaska 1984) ("The very essence of arbitrariness is to have one's status redefined by the state without an adequate explanation of its reason

---

4. The MOA has repeatedly stated that this ordinance shifts the burden of providing funding for the Anchorage Police Department. It has not presented any evidence that taxes in the APSA will change, only that APSA property owners will bear a smaller portion of the police budget from the property taxes they do pay. Taxes in the APSA may or may not be affected by this ordinance, depending on future action of the Assembly. The ordinance itself provides for no change in the taxes for residents of APSA.

5. The court suggests that the Assembly did not make any findings regarding significant change because the Assembly thought it "might not" have the power to alter a service area without a separate vote of the residents of the area to be added. However, the Assembly was certain that

"area affected" was coextensive with areas being created and abolished. Slip Op. at 736, n. 6. I suggest that the Assembly did not make the appropriate findings because it was attempting to disguise its action as being abolition of one area and the creation of another. The court agrees that we should look beyond the Assembly's charade and look instead to the substance of the process initiated by AO 96–30(S). Slip Op. at 732. I agree with the court that AO 96–30(S) was "in substance an alteration of APSA to include the Hillside." Slip Op. at 732. Having conceded this, I do not believe the court may use the municipality's failed attempt to divide the annexation into two votes as a justification for the Assembly's failure to make the required findings of fact.

for doing so ... [t]his court possesses the authority to require [quick take] condemnors to file decisional documents in conjunction with their use of declarations of takings").

In *Southeast Alaska Conservation Council* we commented:

> A decisional document, done carefully and in good faith, serves several salutary purposes. It facilitates judicial review by demonstrating those factors which were considered. It tends to ensure careful and reasoned administrative deliberation. It assists interested parties in determining whether to seek judicial review. And it tends to restrain agencies from acting beyond the bounds of their jurisdiction.
>
> In the present case, the review conducted by the superior court should have focused on the decisional document. If the document was found to contain an inadequate reasoned explanation, the court was authorized to remand it to the agency for supplementation instead of conducting a trial.

665 P.2d at 549 (footnotes omitted).

The requirement of a decisional document received amplification in *Ship Creek Hydraulic Syndicate v. State*, 685 P.2d 715 (Alaska 1984):

> Some decisions are relatively unimportant, and the trouble of explaining them in writing could possibly outweigh any value a written explanation would have. In other cases, the legislature may have specified the procedures an administrative agency must follow, and in order to avoid trespassing on the legislative domain courts should refrain from imposing their own notions of proper procedure on the agency. Furthermore, due process does not require an agency to explain and defend every decision it makes.
>
> Nevertheless, if a statute requires reasoned decisions, and the legislature has not expressly or by implication limited judicial authority to decide how to review adminis-

trative action, courts may and should require agencies to explain their decisions. *Id.* at 717–18 (internal citations omitted).

The Assembly operates predominately as a legislative body, yet in particular situations it is charged with the responsibility for making adjudicative findings. Adjudicative facts are "facts about particular immediate parties." Kenneth Culp Davis, *Administrative Law Treatise,* § 10.5 (1994). Here, the Assembly must determine if the proposed ordinance causes a significant change in the cost affecting the delivery of service to APSA. The Assembly's determination is subject to judicial review in the same manner as actions taken by any administrative agency. This court infers that the Assembly made a finding of fact that the proposed ordinance caused a significant change in cost to the delivery of service to APSA. However, there is no basis for reviewing the Assembly's decision unless findings are contained in a decisional document.[6]

The Assembly's own interpretation of the Charter also requires it to make a finding of significant change within the area affected as a predicate for determining who is eligible to vote on the service area change. AMC 27.10.010(A) ("[T]he term 'area affected' shall mean that area *determined by the assembly to be subject to significant change ....*")

The court determines that "reasonable and not arbitrary" is the standard of review for factual determinations made by the Assembly. Slip Op. at 731–732. We have previously held that an agency's decision is considered arbitrary when it fails to include consideration of an important factor in its decisional document. The Assembly cannot meet this standard when we cannot fulfill our role of ensuring that the Assembly "has given reasoned discretion to all material facts...." If we are to defer to Assembly determinations that are reasonable and not arbitrary, it is necessary to require such factual determinations be contained in a decisional document.

**6.** Under the federal Administrative Procedures Act, an agency must always have written findings in a formal adjudication. 5 U.S.C. § 557(c)(3)(A). In an informal adjudication an agency can be required to produce a written

finding if there is an insufficient basis for the reviewing court to determine if the finding is arbitrary. *PBGC v. LTV Corporation,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

It is impossible to judge whether the Assembly's inferred determination of significant change is arbitrary, because the Assembly has not made a finding. This failure is critical enough to require reversal, even if the court is correct about the meaning of the legislative history, the scope of the definition of "area affected," and the significance of the change wrought by the vote.

### B. The Assembly Failed to Consider the Significance of the Change to APSA.

AMC 27.10.010(A) requires the Assembly to make a finding of significant change before APSA can be included in the "area affected." Cost is the only issue, since it is conceded that it is the intent of the ordinance that there will not be any significant change in the quality or quantity of service to either APSA or the area annexed.

The three documents the MOA cites as supporting the finding of significant change are (1) the preamble to a proposed ordinance ("Hillside Police DTZ") which ultimately failed; (2) the Dusek memorandum analyzing Mayor Mystrom's proposed AO 95–231, and the proposed 1996 police budget; and (3) the Moyer Summary of Economic Effects of AO 96–30, introduced by Assembly member Von Gemmingen, which identifies an approximate real property tax savings of $40 per $180,000 assessed value for APSA real property owners, but a *$600* increase for real property owners in the area annexed. None of these documents constitute a legislative finding that there is a significant change in the "cost . . . affecting the delivery of service" to APSA and the proposed area annexed. What they contain could not provide a basis for such a determination, since the ordinance would establish only "a more equitable means . . . to share in the cost[ ]."

In sustaining the Assembly's action, the superior court concluded ". . . a review of the totality of the information before the Assembly reveals that the Assembly had a reasonable basis to conclude that all Anchorage voters will be subject to significant change. . . ." This court appears willing to assume, as did the superior court, that the Assembly has made such a determination. The preamble to the failed "Hillside Police

DTZ" ordinance does not support a finding of significant change. It only reiterates concerns that Hillside is not paying for police service it benefits from. The only remaining evidence the MOA attorney could cite that bears on the question is the Dusek memorandum and the Moyer memorandum, which differ substantially regarding the increase in real property taxes in the area annexed. Since there is no basis in the record for giving more weight to one author's views than to the other, and since neither author suggests that there will be a significant change in the *cost of the delivery of service,* these memoranda provide no basis for inferring that the Assembly made a finding of significant change.

The court, rather than relying exclusively on the documents the MOA cited as supporting the finding of significant change, reviewed five different documents contained in the record. The court does not determine that the Assembly made factual findings on the failed proposals. Rather, the court relies on the record relating to the various proposals and determines that the Assembly "recognized" that APSA was within the area affected. Slip Op. at 736. The court first relies on the determination by the Assembly that Hillside area residents "substantially benefitted" from safe city functions without having to pay for them. Slip Op. at 737. Benefit derived from a service area is not one of the criteria the Assembly is required to evaluate in determining whether APSA residents were subject to "significant change."

The second memorandum the court relies on to infer the finding of "significant change" is a memorandum which concluded that redistribution of the cost of police service was "fair and equitable." Slip Op. at 737. Again, these are not the factors the Assembly is obligated to review for its factual findings.

The third memorandum the court relies on to support its inference contains the statement that APSA residents are "paying higher property taxes than they should" because Hillside does not pay for safe city functions. Slip Op. at 737. This is a statement in the introduction of a memo from the Mayor on

one of the failed proposals. The memorandum highlights again the concern of the Mayor—Hillside residents are getting subsidized police service when they come into the city. This memorandum does not support a finding of significant change in the delivery of service to residents of APSA.

The fourth item relied on by the court is the attachment to the memorandum from the Mayor. Slip Op. at 737. This "Summary of Economic Effects" again reiterates the benefits accruing to Hillside residents. It uses the mill rate on APSA residents to determine the tax rate for the area annexed. It does not support the court's inference.

Finally, the court cites a memorandum on another failed proposal which again discusses the fairness of taxing Hillside area residents. Slip Op. at 737. The court offers no indication of how this memorandum supports a finding of significant change.

From these five documents the court infers that the Assembly concluded "that APSA would be subject to 'significant change' in the cost of delivering service to it." Slip Op. at 737. This is despite the fact that not one of these documents indicates that there will be any change in the cost of delivering service to APSA. And not one of these documents addressed AO 96–30(S).

## IV. *NO SIGNIFICANT CHANGE*

Even if we once again assume the court is correct, and the Assembly determined by inference that there would be a significant change, that finding would be arbitrary. The proposed area affected is two discrete areas, one of which (APSA) now pays for services, the other of which (the area annexed) does not. The MOA asserts that the significant change in APSA is an approximate $40 reduction in annual property taxes per $180,000 of assessed property valuation. This is a tax reduction that may never be implemented. The $2.2 million cost of police protection allocated in the budget to the area annexed for "safe city" functions amounts to less than

6% of the police budget from real property taxes ($36,707,440), and less than 4.7% of the entire police budget ($42,713,100). The mill rate in APSA would be reduced from 3.62 to 3.40, while the mill rate in the area annexed would increase from 0.00 to 1.70. The only *significant* change that is apparent is that which befalls citizens of the area annexed.[7]

Apparently the court agrees that a speculative $40 reduction in property taxes in APSA is not a significant change. Instead, the court looks to the shifting of the tax burden from APSA to the area annexed, finding that the $2.2 million shift is enough to be significant, despite the fact that no taxes may be reduced in APSA in fact. Slip Op. at 738. However, AO 96–30(S) is intended to leave the police budget unchanged, and the quality and quantity of service unchanged. All that will change is that the cost of police service will be more "equitably" shared by increasing the tax base.

One Assembly member, in an affidavit, explained the discussions held prior to the passage of AO 96–30(S): ". . . the discussion among Assembly members and with the Mayor concentrated on how to find more money to pay ongoing costs of police overhead, whether Hillside residents should pay for police protection, and various political means of expanding police service to the Hillside without a separate Hillside vote of its residents."

The court stresses the benefit Hillside residents obtain from the Anchorage Police Department, including emergency services and investigation of major crimes in the Hillside area. Slip Op. at 730. The court finds it significant that about thirty APD officers reside in the Hillside area and drive their patrol cars home, providing a limited patrol service. Slip Op. at 730. The court also finds it significant that Hillside residents, while representing ten percent of the Anchorage population, represent seventeen percent of the assessed property value. Slip Op. at 730. These facts, while pointing to an

---

7. Even if APSA property owners are credited $40 per $180,000 assessed valuation to make up the $2.2 million in taxes to be shifted, I am not persuaded that this is a "significant change," leaving aside the issue of how cost shifting will affect the delivery of service. The people who are protected by the Charter's Bill of Rights are all of those entitled to vote, not simply those who own property.

inequity in the funding of police service within the boundaries of APSA which inures to the benefit of nonresidents of APSA, do not support a determination that there will be a significant change in cost which affects the delivery of police service to residents residing within APSA.

## V. *CONCLUSION*

The decision of the superior court should be reversed. The superior court found that the voting scheme in AO 96–30(S) rested on a correct determination of the areas affected by Propositions 13 and 14:

> Giving the appropriate [deference] to legislative action, a review of the totality of the information before the Assembly reveals that the Assembly had a reasonable basis to conclude that all Anchorage voters will be subject to significant change in cost, quality, and quantity of police service if a citywide police service area is created.

> The change will affect the tax burden in the old, as well as the new[,] police service area. It will affect the quality of service and its cost throughout the city. It will affect the scope, consistency, and uniformity of delivery of police services citywide to all Anchorage residents. It may affect the quality of police services citywide.

This decision includes findings that are manifestly wrong, including a finding that the quality of police service citywide will be affected, as well as the scope, consistency, and uniformity of such services.

The case should be remanded with instructions that judgment be entered in favor of HALO, declaring that a service area cannot be created or altered unless by a majority vote of those people residing within the boundaries of the area burdened with tax liability it has never before borne. It is these people who make up the "area affected." Surely the area affected cannot include those who by their vote can shift their tax burden onto someone else.

Even if we accept the proposition that one service area can foist its tax burden on an area that has chosen not to be taxed, the issue whether there will be a substantial change in cost affecting the delivery of police service should be remanded to the Assembly for appropriate findings. Although on this record I view the Assembly's actions to be arbitrary and capricious, we need not foreclose the Assembly from authoring a decisional document which attempts to make the requisite determination of substantial change affecting the delivery of service, thereby justifying a vote by the people residing in APSA.